**FEDERAL SIGN AND SIGNAL CORPORATION, Plaintiff,**

v.

**BANGOR PUNTA OPERATIONS, INC., Defendant.**

**No. 70 Civ. 2971.**

United States District Court,
S. D. New York.

March 26, 1973.

Curtis, Morris & Safford, New York City, and Gary, Juettner, Pigott & Culliwan, Chicago, Ill., by William C. Conner, New York City, and Charles F. Pigott, Jr., Chicago, Ill., for plaintiff.

Wyatt, Gerber & Shoup, New York City, and Patrick J. Walsh, Greenwich, Conn. by Douglas W. Wyatt, Eliot S. Gerber, and Albert C. Johnston, New York City, for defendant.

OPINION

TYLER, District Judge.

This action for patent infringement, with counterclaims for antitrust violations and unfair competition, was commenced in July of 1970. Thereafter, the case was tried before the undersigned, sitting without a jury, over a period of nine days in late April and early May, 1972. After a careful review of the entire record—including the more than 1300 pages of trial transcript, the voluminous documentary evidence and the briefs submitted by the parties—and the relevant law, I have made the following findings of fact, and drawn the following conclusions of law.

Plaintiff is a corporation organized under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois. Defendant is a New York corporation, with its principal place of business in Greenwich, Connecticut; it manufactures the allegedly infringing product, an electronic speed computer called the "TDS". Plaintiff is the owner by assignment of the two patents which form the basis of this suit. The earlier of the two is U. S. Patent No. 3,182,331, issued May 4, 1965 to Arthur N. Marshall, for a "Method of Speed Indication" (hereinafter the "Marshall method patent"); the second is U. S. Patent No. 3,530,382, issued September 22, 1970 to John W. Liston, Gordon E. Gee, and William K. Oliver, for a "System for Speed Indication Utilizing Digital Distance and Digital Time Measuring Apparatus" (hereinafter the "Liston patent"). As perhaps suggested by the titles of the two patents, the Liston patent is an electronic digital device designed to practice the methods included in the Marshall method patent for measuring and recording the speed of one moving vehicle from a second vehicle.

More specifically, the nine claims to invention contained in the Marshall method patent and set out in the appendix [1] describe various methods of "de-

1. See Appendix A.

termining and identifying the speed of a checked vehicle from a checking vehicle wherein said checking vehicle has a distance measuring unit which can measure and identify a selected distance traveled by said checking vehicle and a time measuring unit which can measure time and a directly readable speed measuring means which can combine said selected distance and time to identify the speed of said checked vehicle. . . ." Marshall method patent at p. 11. The specifications and drawings of the patent disclose an electro-mechanical computer whereby the methods can be reduced to practical application; although the patent itself is not limited to any particular device, but refers to the methods generally, it is clear that the only means of practicing the methods at the time the patent was granted was via this electro-mechanical computer. Indeed, this particular device is the subject of U. S. Patent No. 3,276,029, issued September 27, 1966 to Arthur Marshall for an "Apparatus for Speed Indication" (hereinafter "Marshall apparatus patent"). Originally, both methods and apparatus claims were included in the same application, but the Patent Office on December 16, 1963 required restriction of the application for purposes of examination, and Marshall chose to prosecute the methods claims first. The Marshall apparatus patent is not at issue in this suit, since the Liston patent represents a substantial improvement in function and performance of the methods, and replaced the more primitive mechanical computer shortly after its development for commercial production.

Although the Marshall apparatus patent is not an issue in this suit, it would be helpful in understanding the application of the Marshall methods and Liston refinements to describe it here. Put briefly, the apparatus is designed to fit compactly into a police car or other "checking vehicle". A rigid base plate serves as mounting for all of the moving component parts. The device has two lead screws, set perpendicular to each other in overlying planes: the "dis-

tance" lead screw is driven by a flexible shaft which is connected to the automobile transmission in which the device is mounted; the "time" lead screw is driven by an accurate constant speed electric motor. A solenoid clutch provides the means for engaging the flexible shaft and distance lead screw; this clutch in turn is controlled by a manually operable "distance" switch. The electric motor is similarly controlled by a manually operable "time" switch, which is placed next to the distance switch. Each of the two lead screws are connected to internally threaded nuts, which in turn are connected to a single movable carriage plate. When the distance lead screw is engaged, it drives the threaded nut, which consequently causes the carriage plate to move in one direction in proportion to the distance traveled by the vehicle; when the time lead screw is engaged, it drives its connecting nut, thereby causing the carriage plate to move in a direction at right angles to the movement caused by the distance lead screw when operated alone, and proportional to the time elapsed. Operated together, or consecutively without resetting to zero, the lead screws cause the carriage to move to a position dependent upon the ratio of time to distance (i. e., speed). An indicator rod and an indicator scale graduated in miles per hour and attached to the carriage provide a directly readable indication of the speed of the target vehicle. Means are also provided for resetting the apparatus to "zero" after a reading has been taken.

As the second introductory paragraph of the Marshall method patent asserts, "the invention is intended to be used with the vehicles of law enforcement officers, enabling them to quickly and accurately check the vehicle speeds of potential violators of highway speed laws including the speed laws of urban localities and highway or turnpike speed laws." The various claims of the patent describe methods of using the specified apparatus for determining the speed of one car from another moving vehicle,

whereby the time switch of the apparatus is closed when the checked target or vehicle passes a first reference point and stopped after the vehicle passes a second selected reference point; the distance switch is closed when the checking or police vehicle passes the first reference point, and stopped when it passes the second reference point. The resultant speed indication reports the average speed of the checked vehicle between the two points selected.

It should be noted that the apparatus in effect measures the distance traveled by the target vehicle and the time in which it takes to travel the distance, and combines the two to yield the resultant average speed. The distance measurement can be made either before, during, or after the time measurement, and the speed of the target vehicle need bear no relation to the average speed of the police car between the two selected reference points. The checking vehicle can proceed either over a path "substantially equivalent" to that traveled by the target vehicle (claim 1), or over an "equal path" (claim 2). Claims 3 and 4 refer to methods for recording the speed of the target vehicle when measured in the manner described in claims 1 and 2, respectively. Claim 5 describes a method of determining the speed of a checked vehicle where the distance measurement is taken first, so that the checking vehicle remains stationary while timing the checked vehicle. Claim 6 describes a method of speed determination whereby the distance measurement step occurs after the starting of the time measurement. Claim 7 describes a speed determination method whereby both time and distance measurement steps are commenced simultaneously; claim 8 describes another method of simultaneously commencing time and distance measurement as the checking vehicle passes the target vehicle. Claim 9 describes a method whereby the speed of a checked vehicle is determined as it travels toward the checking vehicle.

Plaintiff also complains that 19 claims of the Liston patent[2] are infringed; all of these are directed to various combinations of circuits and circuit elements of an electronic computer, which is designed to be mounted in one vehicle for determining the speed of another vehicle as described in the Marshall method patent. For present purposes, the Liston patent is sufficiently described in the abstract to the patent:

"An improved speed measuring and indicating apparatus which can be mounted in a first vehicle and operated therefrom to determine the speed of a second vehicle, the apparatus including first means coupled to the driving mechanism of the first vehicle for generating a number of electrical pulses proportional to the distance traveled by the first vehicle, second means for generating a number of electrical pulses proportional to the time required for the second vehicle to travel the same distance, and means for dividing the distance pulses by the time pulses to indicate the average speed of the vehicle over the foregoing distance, the apparatus also including readout means for indicating such speed and time and distance switches for manual actuation by an operator."

Plaintiff is also the owner by assignment of the registered trademark "BASCAR", an acronym for Visual Average Speed Computer And Recorder. The trademark was registered by Arthur Marshall in 1966 and orginally applied by him to his electro-mechanical apparatus. Plaintiff currently utilizes the trademark to designate its speed computer produced under the Liston patent.

As of the date of trial, plaintiff had sold over 5000 VASCAR speed computers, and paid approximately $390,000 in royalties under the Marshall patent. Most of these sales were of the electronic computer type as specified in the Liston patent, the commercial production of

2. See Appendix B.

which began in 1968. Since that time, plaintiff has widely advertised its speed computers, and they have been widely accepted—to the extent that nearly 40 different states have purchased the devices for use in traffic control.

Defendant has been producing for commercial sale since 1969 an electronic speed computer known as a "TDS" computer (for Time, Distance, Speed). The TDS is a computer module designed to be utilized in speed enforcement programs of law enforcement agencies, and it is undisputed that it can practice, and has been utilized to practice, the methods of the Marshall method patent. Since 1969, defendant has sold approximately 250 of its TDS speed computers, principally to the states of North Carolina, Wisconsin and Florida. It is the production and sale of the TDS computers which plaintiff alleges to constitute infringement of its two patents in this suit.

In addition to denying that the sale of its TDS computers infringes in any way the patents of plaintiff, defendant has unleashed a veritable broadside of affirmative defenses and counterclaims. The affirmative defenses attack the validity of the patents in suit, on the grounds, *inter alia,* that they do not promote the progress of science; that they lack novelty; that they are obvious and wholly anticipated in the prior art; that the subject matter was in public use or on sale for more than one year prior to the filing of the applications; that the subject matter was abandoned; that the specifications are ambiguous and overbroad, and fail to adequately disclose the subject matter to permit application or use of the invention. In addition, defendant has counterclaimed: (1) for declaratory judgment that plaintiff's patents are invalid; (2) for damages under the antitrust statutes, 15 U.S.C. §§ 1 et seq., alleging that plaintiff monopolized the market through its fraudulent procurement and use of the patents; and (3) for damages for unfair competition under 28 U.S.C. § 1338(b).

*I. Infringement of Plaintiff's Patents*

Defendant did not seriously contest at trial the charge that the manufacture, sale, and demonstration usage of its TDS speed computers directly and contributorily infringe, and actively induce infringement of, the nine claims of the plaintiff's Marshall method patent and claims 1 through 6, 9 through 15, and 17 through 21 of the Liston patent, within the meaning of 35 U.S.C. §§ 271(a), (b) and (c). Indeed, the record is relatively clear on this initial issue.

Defendant sells its devices through approximately 60 independent law enforcement equipment distributors and through several manufacturers' representative operations. It also distributes all over the country and at trade shows a significant volume of sales material, included within which are descriptions of use of the TDS computer to measure the speed of target vehicles. There are also frequent visitations to defendant's factory by police agencies, during which demonstrations are given for various modes of using the TDS for measuring the speed of target vehicles. Finally, a training manual is included with the purchase of each TDS unit. These materials and demonstrations make clear beyond peradventure that the TDS computer is designed principally to practice the methods described in the Marshall method patent, and that is so utilized. Nor is there much merit to defendant's contention that there are other substantial non-infringing uses for the TDS computer—the chief such use cited being to measure the speed of the vehicle in which the device is mounted. As defendant's own sales material candidly asserts, "[t]he Smith and Wesson TDS Computer is an electronic time and distance speed measuring device used in a patrol car to determine the vehicle speed of potential traffic violators." Plaintiff's Exhibit 146.

Defendant seeks to rebut this conclusion that it has infringed the Marshall method patent by asserting that virtually all of the 250 TDS devices it sold were

purchased by governmental agencies for police use in the states of North Carolina, Wisconsin, and Florida—which agencies had previously purchased plaintiff's VASCAR devices and applied the Marshall methods. Since plaintiff's practice was not to charge a purchaser for a license under the Marshall method patent independently of the price for the VASCAR device, it is argued that these purchasers received an implied license to practice the methods, which persisted even after the purchasers decided not to utilize the VASCAR devices any longer. It is further contended that plaintiff could not enforce the restriction of practice of the methods to use with the VASCAR device, since this would constitute an illegal tie-in. Thus, defendant concludes that it cannot be guilty of contributory infringement, since it sold only to purchasers who could not be accused of directly infringing the Marshall method patent.

This argument ignores the fact that plaintiff never refused to grant any prospective purchaser a license under the Marshall method patent; indeed, as the evidence indicated, plaintiff was never asked for such a license. Secondly, the record establishes that plaintiff was proceeding in good faith to rely upon the validity of its Liston patent, which covers the VASCAR device. These facts are sufficient to distinguish this situation from those where a patentee seeks to extend the coverage of its patent monopoly by tying in sales of unpatented goods with its patented products or processes. See, e. g., Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). Finally, the contentions of defendant cannot escape the thrust of §§ 271(c) and (d): the fact that VASCAR purchasers have been previously licensed to use the Marshall methods does not establish that subsequent purchasers will be so licensed, or that defendant did not sell its devices "knowing the same to be especially made or especially adapted for use in an infringement. . . ."

As for the Liston patent, the situation is similar, although somewhat more complicated due to the complexity of the apparatus. Claim 1 is essentially the lynchpin of the Liston patent, upon which the remaining claims are dependent. It is directed to a combination of various circuits and elements of an electronic computer, including the following: distance pulse generating means which generates a plurality of electrical pulses proportional to the distance traveled by the vehicle in which the computer is located; time pulse generating means which generates electrical time pulses proportional to elapsed time; manually operable distance switch and time switch means; electrical distance counter means and electrical time counter means, operatively connected to the distance and time switches, to count the distance and time pulses; divide circuit means for "in effect" dividing the number of distance pulses contained in the distance counter by the number of time pulses in the time counter, such that the quotient will be indicative of the speed of the target vehicle; speed readout means for visual display of this speed.

The TDS speed computers contain virtually all of the elements and circuits described above. The one principal difference is that the TDS does not use divide circuit means for combining distance and time pulses to obtain the resultant speed of the target vehicle. Rather, the TDS utilizes a different circuit, which includes a repetitive strobe of complements and a scale circuit, and operates as follows: When the time and distance switches are closed, distance and time pulse generators feed pulses respectively of 1000 per mile and 10 per second into distance and time counters. When the time and distance switches are opened, the computation commences. The complement of the number of these pulses in the primary counters is then fed into secondary registers (the complement being the difference between the capacity of the register and the number of pulses in the primary counter). A

computer clock sends pulses simultaneously to both secondary registers, at a ratio of 360 pulses to the secondary time register for each one pulse sent to the secondary distance register. Every time the secondary time register is filled to capacity by these clock pulses, an output pulse is sent to the readout circuit. The time register is reset to the complement of the number of pulses in the primary time register repeatedly until the secondary distance register is filled once to capacity. At this time the computation is completed: the number of times the secondary time register is filled is equal to the number of pulses in the time counter divided into the number of pulses in the distance counter, multiplied by 360; this 360 multiplier is a conversion factor which produces the resultant speed indication measured in tenths of a mile per hour. Although this process is seemingly complex, it can be seen that it effectively divides distance into time; this is sufficient to bring the function within the language of the first claim of the Liston patent, which requires only divide means which "in effect" divides distance pulses into time pulses.

The similarities between the remaining claims and the TDS computer will only briefly be described here. The TDS is adapted to be connected to the odometer drive connector on the automobile transmission (claim 2). The TDS also has distance register means whereby distance information in the distance counter can be retained on a non-destruct basis to permit several speed computations with the same distance input as described in the "park and wait" method of the Marshall method patent (claim 3 of the Liston patent). Both the Liston patent and the TDS have "compute start means" (claim 4). Although claim 5 specifies a four-element "and" gate means, and the TDS has two conventional (two-element) "and" gates, they both perform the equivalent functions. The divide circuit means specified in claim 6 includes means of repetitive subtraction; the TDS provides for the substantial equivalent by entering the complements of time and distance pulses in secondary registers and adding clock pulses to these registers until filled— effectively adding counts to a negative number until it reaches zero. The TDS also has binary coded decimal counters and a digital speed readout, consisting of tubes lighted by decoder/drivers (claim 9). Claim 10 describes reset means selectively operable to reset the entire device or to reset just the time component and readout; the TDS contains an erase switch which clears time and distance circuits, and a distance lock, which provides for the retention of the distance information upon actuation of the erase switch. The TDS has a time pulse generating means which is an oscillator means producing a predetermined number of time pulses per second, and which is actuated by the manually operable time switch (claim 11). The TDS distance and time counter means are binary counters (claim 12). The current production models of the TDS (Models 5 and 5–1) have means responsive to overflow pulses from the distance counter means to indicate to the operator that the capacity of the distance counter has been exceeded (claim 13). The TDS distance pulse generating means is comprised of a light source, a photosensitive element, and an interrupter, which consists of a cylindrical rotor with four equally spaced openings allowing light to strike the photosensitive element four times for each revolution of the rotor. This is within the description of claim 15. Claim 17 specifies that the interrupting means is connected to the odometer cable; the TDS distance pulse generator is adapted to be so connected. The TDS contains the error indicating means specified in claim 18, as well as the combinations of the foregoing claims which are described in claims 19, 20 and 21.

In sum, although the TDS speed computer may differ in some details from the specifications in the Liston patent, I find that it is sufficiently covered by the claims to invention heretofore cited

such that its production, sale and use by defendant constitute infringement of those claims within 35 U.S.C. § 271.

■ Thus, I find that plaintiff's two patents are infringed directly and indirectly as charged. The next step, of course, is to determine whether, given the infringement, they can be enforced in the face of defendant's attack on their validity.

## II. Validity of the Marshall Method Patent

Section 101 of 35 U.S.C. provides for the patentability of the invention or discovery of "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof. . . ." "Process" is defined by 35 U.S.C. § 100(b) as "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." Certain conditions are then imposed for patentability of an invention as defined; among these is the requirement that the invention not have been "patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . ." 35 U.S.C. § 102(b). Section 103 then imposes a further condition:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not. be negatived by the manner in which the invention was made."

Defendant attacks the validity of the Marshall method patent principally on the grounds that it is obvious, and that it was in public use or on sale more than one year prior to the filing of the patent application in 1963. The issue of obviousness will be resolved first; as will become apparent, the novelty of the invention is not seriously in dispute, since the standard is to be liberally construed, and the prior art contains no identical disclosure of the method claims. Shaw v. E. B. & A. C. Whiting Company, 417 F.2d 1097 (2d Cir.), cert. den. 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811, reh. den., 398 U.S. 954, 90 S.Ct. 1866, 26 L. Ed.2d 298 (1969); Rich Products v. Mitchell Foods, Inc., 357 F.2d 176 (2d Cir. 1966).

### a. Obviousness of Marshall Method Patent

As the Supreme Court has observed:

". . . the § 103 condition . . . lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

There were several methods utilized by police to measure the speed of potential traffic violators prior to the development of the Marshall and Liston patents. Three of these methods involve premeasuring a selected distance along a highway, and timing the vehicles as they traverse the distance: the average speed of the target vehicle is then computed by dividing distance by time. The Enoschope method entails the positioning of two mirrors on opposite sides of the road, with one mirror at a 45 degree angle to reflect light along the road so that it is visible to an observer with a stopwatch at the end point; as the vehicle passes the mirrors, the person timing it starts a stopwatch when he sees the flash of light, and stops the watch when the vehicle passes his own terminal

position. A variation of this technique is the "speed watch", where two hoses are laid parallel to each other across the road, and connected to a timing device, which is actuated when the vehicle crosses the first and stopped when it crosses the second. Both of these methods require the use of equipment which is readily visible to the motorist; in addition, several police personnel are necessary to man the stationary equipment and the chase vehicle. A third variation, the "aerial survey", involves visual observation of vehicles by airplane, timing them by stopwatch as they traverse painted markings on the roadway, and then radioing ahead to the "chase" car to apprehend violators.

Another method of measuring the speed of traffic vehicles, and one in use throughout the country, is by radar. Radio signals are beamed down a roadway by an electronic unit; the difference between the frequency of the transmitted signals and the frequency of the signals reflected by oncoming vehicles is proportional to the speed of the vehicle. Speed detection by radar has its difficulties, however; the radar unit must be set up and recalibrated every time a new position is selected. The radar unit is also visible to motorists. In addition, police personnel must be stationed at a particular point and perform only that function. Finally, there are a variety of factors involved in the measurement of frequency differentials which render radar unreliable under certain conditions.

It should be noted that none of these prior methods of speed detection could be performed by one policeman in the course of discharging other regular patrol duties: all of the methods involve the pre-positioning of observer, timing device, and pursuit vehicle, in addition to the demarcation of the segment of the roadway over which the vehicle is to be timed. Indeed, the only technique for measuring the speed of a moving vehicle from another vehicle which is contained in the prior art is that of "speedometer pacing", whereby the police vehicle trails the target vehicle at a fixed distance for a certain length of time, so that the police vehicle is proceeding at the same speed as that of the target vehicle. Again, an alert motorist might easily detect such trailing; since the speed of the police vehicle must be the same as that of the target, moreover, an accurate speed indication may be difficult if the traffic is heavy or the path of travel uneven. Finally, there is no means of recording the speed so "clocked", other than in the memory of the policeman.

Given this background, it can be seen that the Marshall method patent represents a substantial advance over the prior "art" of speed detection. A police car equipped with an apparatus capable of performing the steps described in the patent need not be positioned in any predetermined spot; the vehicle need not trail the target vehicle at a constant speed or distance—or even, for that matter, "trail" the target vehicle at all. The measuring devices are not visible to the motorist, and the measurements themselves can be made virtually anywhere. The actual measurement and recordation of speed, and the apprehension of violators, can be performed by a single policeman in a single vehicle; since the speed measurement can be made from a moving vehicle, the police car can proceed with other patrol duties as well. In sum, the Marshall methods permit a much more efficient utilization of limited police resources while increasing the likelihood of apprehension of speeders.

Whether this advance over the prior art of speed detection would have been obvious to a person having ordinary skill in the art at the time of invention is another matter. Defendant contends that it would be "unconscionable" to monopolize the well-known principle of measuring the distance traveled by a vehicle, measuring the time elapsed in traveling the distance, and dividing the distance by time to derive the speed or velocity of the vehicle. On this basis,

it is argued that the Marshall methods are not substantially distinguishable from the Enoscope, Sky Watch, and Speedometer Pacing methods discussed above. But surely this misses the mark: the Marshall method patent claims as invention a particular *method* of measuring time and distance, and of combining the two to determine the speed of another vehicle; none of these other techniques teaches the utilization of a speed detector within the car for performing the methods as specified, nor can it be said that the Marshall methods represent an obvious derivation or extension of the principles taught in these techniques.

But the resolution of this contention casts into even sharper focus the second horn of this particular obviousness dilemma. Arthur N. Marshall was perhaps not the first to think of the "concept" of measuring the speed of a moving vehicle from another vehicle with the use of a speed computer or apparatus—but he was the first to reduce this concept to practical application. And it has been the rule for some time that for a process to be patentable, at least one mode of reducing it to practical use must be disclosed. See, e. g., Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880); Expanded Metal Company v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1909). Put differently, Marshall invented both a method and an apparatus to practice the method. Given the invention of the apparatus, the method might indeed seem obvious; yet at the time of the filing of the application for the method patent the only apparatus which could practice the method was that disclosed in the specifications of the application.

Defendant sought to rebut at trial the conclusion that the prior art contained no such apparatus that could practice the Marshall methods, by introducing a number of patents which are set out in the margin.[3] At trial, however, defendant's expert witness Craig Garretson, an associate professor of physics and engineering at C. W. Post College, only identified two of these (Eaton and Pellerin) as capable of performing any of the Marshall methods, namely those indicated in figures 13 and 14 of the specifications. On cross examination, however, Dr. Garretson was led to admit that both patents disclosed devices which were intended to measure the speed of the vehicle in which they were set, and over relatively long periods of time. Indeed, all five patents relied on by defendant disclose mechanical computers which are principally designed for this purpose; none contain separate time and distance switches, moreover, which are capable of independent operation to permit separate measurement and storing of the time and distance information necessary for the computation of speed of another vehicle. Finally, it should be noted that Dr. Garretson had not seen the mechanical embodiment of any of these patents —including the Marshall apparatus—and based his testimony on his reading of the patents alone. No evidence was provided which indicates that any of these computers were capable of performing the Marshall methods as specified in an efficient manner without substantial redesign, nor does it appear that any of these devices was so redesigned to perform these methods.

3. U.S. Patent No. 1,450,410, dated 4/3/23, for an "Indicator" (Cox); French Patent No. 668,791, dated 7/22/29, for an "Apparatus for Indicating the Ratio of Two Variables" (Palme); U.S. Patent No. 3,172,722, dated 3/9/65, for a "Photographic Speed Measuring Apparatus" (Brown); U.S. Patent No. 1,407,134, dated 2/21/22, for a "Calculating Instrument" (Eaton); U.S. Patent No. 2,903,322, dated 9/8/59, for a "Vehicle Maximum Speed Indicator" (Webster); U.S. Patent No. 2,341,118, dated 2/8/44, for a "Vehicle Speed Recorder" (Rodanet); U.S. Patent No. 1,907,549, dated 5/9/33, for a "Method of Measuring Speeds Photographically" (Kahrs); U.S. Patent No. 2,871,088, dated 1/27/59, for a "Method of Obtaining Evidence of Traffic Signal Violations" (Abell); U.S. Patent No. 3,036,762, dated 5/29/62, for a "Trip Speed Averager" (McDonough).

The analysis of the prior art, and its comparison with the patent in suit, as directed by the Supreme Court in Graham v. John Deere Co., *supra*, by no means disposes of the issue of obviousness. In a frequently cited passage, Judge Learned Hand described the plight of the court when confronted with such a situation:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar. . . . To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?" Reiner v. I. Leon Co., Inc., 285 F.2d 501, 503–504 (2d Cir. 1960).

Since no direct evidence was introduced at trial as to what an individual familiar with the "art" would have considered obvious at the time of the invention, this court is basically left with its own judgment, to be guided by the "sign posts" suggested by Judge Hand, and which received favorable comment by the Supreme Court in *Graham*.

In this case, all of the signposts point to an indication of nonobviousness. The evidence at trial establishes that Arthur Marshall conceived his idea and reduced it to a rough prototype in 1958; on November 3 of that year he filed his first patent application for a "Speed Indicator", which also contained at least the broad outlines of the method claims which were to become the subject matter of his second application filed in 1963. Not until December of 1965 was the first mechanical speed detection device sold— to the Indiana State Police. Over this period of time, Marshall logged over four thousand hours of travel and consultation with state and local police, and spent over $150,000 in developing his VASCAR computer and winning over the public before it was sold. Since assigning his rights to his two patents to the plaintiff in March of 1967, Marshall and his group, as stated heretofore, have received from plaintiff over $390,000 in royalties.

The evidence also indicates that the initial resistance of potential purchasers was finally overcome only after significant efforts; but at present VASCAR is enjoying great commercial success and is rapidly supplanting older methods and devices for speed detection. The need for such an invention existed since the development of the automobile; the long existence of the means necessary to bring about the invention, and its very simplicity, suggests that the invention was by no means "obvious" to those familiar with the art or the problem.

The conclusion that the Marshall method patent is not invalid for obviousness is strengthened by the presumption of validity which 35 U.S.C. § 282 invests in every patent. It has been observed that this is

". . . a presumption which is perhaps too often minimized in the courts. . . . Expertness and experience in passing upon patents lie primarily in the Patent Office and these important factors are only partially offset by the greater concentration and the additional relevant evidence which can be brought to bear in any particular patent litigation in the courts. The presumption of validity is entitled to particular weight when, as here, the file wrapper discloses a careful consideration in the Patent Office before issue." Georgia-Pacific Corporation v. United States Plywood Corporation, 258 F.2d 124 (2d Cir.), cert. den., 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

The file wrappers of the several Marshall applications reveal that the

Patent Office indeed paid careful attention to the patentability of the claimed inventions. The original application for a patent for a "Speed Indicator" was filed on November 3, 1958; on May 27, 1959, the claims were rejected in light of Palme, among others. On November 24, 1959, Marshall amended his second claim, and added two new claims, one of which was for a method of determining the speed of a motor vehicle. These two new claims were again rejected in April of 1960 as indefinite and unpatentable over Palme in view of Gordon. A new (apparatus) claim 5 was added by Marshall in October, 1960; this was finally rejected. On November 22, 1960, Marshall filed a Rule 116 amendment, adding a new method claim 6, which he alleged was omitted from his prior amendment through inadvertence, to replace rejected method claim 4. This amendment was not permitted by the Patent Office, however; thus, Marshall took his appeal from the final rejection of his remaining apparatus claim in April of 1961, and additionally requested that claim 6 be entered. On appeal, only the apparatus claim was considered, since it was held that the method claim was not properly within the appeal. On March 29, 1963, the Examiner's decision rejecting this claim was upheld on the basis that ". . . the claim presented . . . does not distinguish appellant's arrangement with sufficient particularity from the device shown by Palme."

Shortly before this final rejection of his original application, on February 11, 1963, Marshall filed a second application, asserting that this was "a continuation-in-part of my prior copending application Serial Number 771,276, filed Nov. 3, 1958. . . ." Both apparatus and methods claims were described in much greater detail than in the original application. On December 16, 1963, the Examiner required Marshall to restrict his application for examination, and provisionally to elect to pursue either his apparatus or his method claims, since the Examiner had determined that

"[t]he two inventions as grouped above are distinct each from the other because the methods as claimed are not the exclusive process of using the apparatus." Consequently, on June 17, 1964 Marshall amended his application and elected to pursue his methods claims; by way of a supplemental amendment dated September 2, 1964, he cancelled his apparatus claims and asserted that they would be included "in a continuation-type case to be filed." Certain statements in this supplemental amendment indicate, however, that the Examiner requested Marshall to cancel his reference to his original 1958 application. Marshall complied with this request, but added the following: "In canceling this paragraph, applicant does not, of course, sacrifice or abandon its legal right to rely on its earlier filing date of its abandoned application for any *invention* common to the two cases." On May 4, 1965, the amendment was allowed and a patent issued; the references cited by the Examiner were Kahrs, Rodanet, Abell, Webster.

Marshall's other division of his application, that for an apparatus patent, was allowed in part on September 27, 1966, certain of the claims having been rejected as substantially met by Cox. The references cited by the Examiner were Cox, Webster, and an English patent, unnamed in the file wrapper.

Thus, the Patent Office considered virtually all of the prior art cited by defendant as indicating the obviousness of the Marshall method patent. The only two patents which were introduced by defendant and not cited by the Patent Office were those of Eaton and of McDonough. The Eaton patent, U. S. Patent No. 1,407,134, dated February 21, 1922, is for a "calculating instrument", designed for "giving a direct reading of the quotient of two factors one of which increases or decreases at a variable rate". As previously noted, this invention was intended to relate specifically to measuring the speed of the vehicle in which it was placed; it cannot be

said to teach the methods claimed as invention in the Marshall method patent. The second patent, to McDonough, U. S. Patent No. 3,036,762, was issued on May 29, 1962 for a "Trip Speed Averager", which is "a device capable of continuously indicating the average speed over the distance which has been traversed". Again, the relevance of this invention to the Marshall method patent is elusive, and defendant did not pursue the matter at trial beyond its introduction.

■■ It has been clear at least since the case of Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139 (1876) that a process itself is patentable, independent of the means utilized to practice it. Defendant seems to argue in a post-trial letter dated January 8, 1973 that the absence of alternative means of performing the methods make them somehow functional and unpatentable. But the recent relevant law is to the contrary, Application of Tarczy-Hornoch, 397 F.2d 856, 55 C.C.P.A. 1441 (1968). The policy underpinnings for this position are persuasively stated in the *Tarczy-Hornoch* decision, 397 F.2d at 868:

> "The essential difficulty is in the fact that, although at the time of the application only one apparatus may be known which is capable of carrying out the process, others may become available later. In which case, of course, the inventor may be cheated of his invention. It is peculiarly our responsibility to see that the decisional law does not require this kind of inequity."

■ Although courts are not to permit excessive extension of the monopoly power inherent in the grant of a patent, they must also recognize that the patent represents one of the most significant spurs to inventive activity in a mixed, capitalist economy. On the basis of all of the evidence, defendant has failed to establish that the Marshall method patent is lacking in novelty or that it would have been obvious to one ordinarily skilled in the art.

*b. Public Use or Sale of Marshall Method Patent*

■ Defendant also contends that the method claims covered in the Marshall method patent were "on sale" or in "public use" more than one year prior to the filing of the application on February 11, 1963. 35 U.S.C. § 102(b). Although the issue is rather close, I find that the patent is not invalid for these reasons.

The first disclosure of his invention was made by Marshall to his patent attorney in 1958, prior to the filing of his original application. At approximately the same time, Marshall approached the Superintendent of the Virginia State Police to explore the possibility of there being any practical application of his invention for policemen. According to Marshall, the Superintendent voiced doubts about the problem of depth perception, and the matter was dropped.

After the filing of the application, Marshall sought a manufacturer to develop his device and to get it onto the market. In early 1959, he demonstrated the original apparatus to the President of a company called Robertshaw-Fulton; after some consideration, the company decided not to pursue the matter, but sent Marshall a check for $1000 for his time. Then on March 18, 1959, Marshall assigned his rights under his pending patent application to Southern Steel & Stove Corp., under a contract to improve the apparatus. Southern was unsuccessful, being largely bothered by the problems of timing and depth perception in the use of the apparatus; in July of 1959 they notified Marshall of their decision not to continue, but did not "return" his patent rights until January 23, 1961, this formality apparently not being considered necessary by Marshall until that time. There is no indication in the record, however, that Southern ever made any sales effort to market VASCAR.

In June, 1960 Marshall and a local firm, Progressive Engineering Corporation, developed a second version of the

apparatus, which represented a significant improvement: time and distance planes were superimposed; new speed indication means with more accurate gradations were introduced; two switches were added, placed close to each other for easy manipulation; a new means of easily and precisely zeroing the equipment was also included. After this development, the Franklin Institute in Philadelphia was engaged to test the device on a confidential basis. Following a successful analysis, Marshall, in October, went to the convention of the International Association of Chiefs of Police (IACP) in Washington, for the "dual purpose" of learning more about police operations, and identifying the organizations which sold to police units. While there, he talked to the sales manager of a company called Federal Laboratories.

Approximately one month later, Marshall went to the Federal Laboratories factory and demonstrated his machine. He left it there for their examination; they in turn employed a retired police lieutenant, Lieutenant Venia, to use the apparatus and to evaluate it. In April, 1961, Federal Laboratories determined that it was not interested in the Marshall device.

Similarly, in May of 1961, following the Federal Laboratories rejection, Marshall demonstrated his machine to Kent-Moore Organization, Inc., in Detroit, leaving it with them for analysis. They in turn dropped the matter in July, 1961.

This was essentially the last "promotional" activity undertaken by Marshall prior to February 11, 1962—the critical date for § 102(b) purposes. In early 1962, Marshall and Progressive Engineering rebuilt the machine again, this time coming up with a slightly smaller, somewhat improved version. Following this came a period of over a year's inactivity, as Marshall devoted himself to certain real estate interests of his. Then, in September, 1963, he took the improved machine to the executive offices of the IACP, and consulted with its research division. Finally, in February-

March of 1964, Marshall launched a concerted campaign to police organizations across the country, in which he demonstrated his invention, and distributed a prepared brochure. Defendant contends that this activity prior to February, 1962 proves that Marshall had in effect put his methods into public use, and that his efforts were directed towards determining the salability of his invention, rather than its workability.

■ The kind of "public use" contemplated by 35 U.S.C. § 102(b) seems to be that of public disclosure or of commercial exploitation. Experimental use of the invention, however, is not to be considered public use. Robine v. Apco, Inc., 386 F.2d 267 (2d Cir. 1967); Shaw v. E. B. & A. C. Whiting Company, *supra*.

Although defendant asserts that Marshall made no attempt at secrecy in his dealings, the evidence presented at trial leads to the contrary conclusion. Marshall testified specifically that he discussed the confidentiality of his invention with everyone with whom he consulted. This is reinforced by certain correspondence between Marshall and several of the organizations with whom he had contact in this period of time. The fact that Lt. Venia, an employee of Federal Laboratories, demonstrated the apparatus to several former associates, *does not amount to the kind of disclosure which would invalidate the patent in question*: these demonstrations were merely part of Venia's assigned task of evaluating the performance of the *device*, and there is no indication in the record that the specific methods involved in this suit were actually disclosed. Moreover, no proof was adduced that any of the companies with whom Marshall dealt in this critical period actually made any sales effort.

■ The rule prohibiting commercial exploitation of an invention for more than a year before the application for a patent is designed to insure that an inventor will not be able to extend the patent monopoly for more than the statutory period by delaying the filing of

his application. But here Marshall had filed a patent application in 1958; although the claims contained therein are directed principally to the apparatus, the specifications also reveal the outline of the methods subsequently patented under his "continuation in part" application. There is no evidence that Marshall in fact delayed his application; rather, the initial application was somewhat artlessly phrased, so that its terms were too ambiguous to qualify for patent, and required consequent reapplication.

■ Marshall was essentially submitting his *apparatus* to various companies for testing and evaluation with the purpose of developing the device for manufacture and production. It was not "on sale" in the traditional sense. See, e. g., Amphenol Corporation v. General Time Corporation, 397 F.2d 431 (7th Cir. 1968); Chemithon Corporation v. Procter & Gamble Company, 287 F.Supp. 291 (D.Md.1968), aff'd. per curiam, 427 F.2d 893 (4th Cir.), cert. den., 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). Rather, Marshall had but one model of his apparatus invention, which he was in the process of developing over the period. This was not a submission by sample to a prospective purchaser; instead, Marshall was looking for a company to acquire the rights *under his patent application,* to produce and distribute his apparatus which could practice his methods. Aside from the difficulty with the concept of these particular methods ever being "on sale" in such a situation, I find that Marshall's disclosure of the methods in his pursuit of a manufacturer for his *apparatus* did not constitute public use or sale such as to invalidate his patent.

■ One final point should be addressed here. Plaintiff contends that it is entitled to the benefit of the earlier filing date, conferred by 35 U.S.C. § 120, of Marshall's original (1958) patent application. The 1963 application did in fact refer to the original application, but the Patent Office required that the reference and the characteriza-

tion of the application as a "continuation-in-part" of the earlier one be stricken. Marshall did this, but purported to reserve all rights to any inventions disclosed in the original application. In this respect, it should be noted that § 120 refers only to the *application* for patent, which must contain the required reference; the invention in the original application, however, must be disclosed in accordance with § 112. Although the specifications of the original application do contain certain directions as to the practice of the methods, these are not disclosed with the particularity required by § 112; moreover, the original application does not "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." In other words, the claims of the original application are not readable onto the claims of the subsequent application, nor are the specifications sufficiently precise, to entitle the 1963 application to claim a filing date of 1958. See Carter-Wallace, Inc. v. Otte, 474 F.2d 529 (2d Cir. 1972). This was the basis, presumably, for the Patent Office's requirement that reference to the prior application be stricken.

*c. Inadequate Disclosure of Mode of Utilizing Methods*

■ Defendant also argues that the Marshall method patent contains no disclosure of how to visually determine when the target vehicle passes certain checking points, given problems in depth perception, and that this failure renders the patent invalid because of inadequate disclosure. 35 U.S.C. § 112. More specifically, defendant asserts that the use of shadows is essential to successful practice of the Marshall methods, that Marshall knew of this "shadow technique" for a long time, and that his failure to reveal this in his patent renders it invalid. But at trial, defendant's own witness, Trooper Aldin Asp, testified that shadows were really only one means of overcoming the parallax problem, and

that he himself utilized other means as well—such as a bumper flash going over a hill, triangulation, crossing railroad tracks or other lines or patches on a road. I find that the patent sufficiently discloses the mode of utilizing the methods to comply with § 112, and that the shadow technique in particular would be obvious to one acquainted with the teachings of the Marshall method patent, and is only one means of correcting the problem of depth perception.

In sum, I conclude that the Marshall method patent is valid, and that the claims to invention included therein are entitled to protection against infringement by defendant.

### III. Validity of the Liston Patent

As in its attack on the Marshall method patent, defendant challenges the validity of the Liston patent on the grounds, *inter alia*, of obviousness and of public use or sale more than one year prior to the filing of the application for a patent.

#### a. Obviousness of the Liston Patent

Plaintiff admits that "most if not all of the individual electronic circuits and circuit components used in the device described and claimed in the Liston et al patent . . . are all separately old and have been used before in different combinations to perform different computer functions." Plaintiff's Post-Trial Proposed Finding of Fact No. 64. Plaintiff claims, however, that the Liston patent describes a combination of these old elements, which itself represents a unique configuration, and that this development of a "fool-proof" in-car speed computer is by no means obvious.

A combination of old elements is patentable "only when the whole in some way exceeds the sum of its parts. . . ." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). The fact that the old elements had not previously been so combined does not itself resolve the issue, Lemelson v. Topper Corporation,

450 F.2d 845 (2d Cir. 1971), cert. den., 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972), nor is commercial success pertinent, absent the required showing of invention. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

The problem is thus to determine whether the combination of old elements represented by the Liston patent would have been as a whole "obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . . ." 35 U.S.C. § 103. Here the relevant date is February 27, 1969, the filing date of the Liston patent. On the basis of the evidence presented at trial, it is my conclusion that the Liston patent is invalid as failing to meet the stringent standards for invention for combination patents in this circuit.

Defendant's principal witness at the trial on this issue was Dr. Craig Garretson, an associate professor of physics and engineering at C. W. Post College. Dr. Garretson only received his Ph.D. in electrical engineering in 1969, but had received his bachelor's degree in electrical engineering in 1949 and his master's in 1953. Although his testimony is to be considered in light of the fact that he had never had any industrial experience in the *design* of digital computers in 1967–68, when the Liston device was developed, it was evident at trial that he was familiar with their operation, and had subsequently acquired more experience through his work at C. W. Post. Put briefly, Dr. Garretson testified persuasively that the elements and their combinations as embodied in the Liston patent would have been obvious to one familiar with the art in 1967–68. Indeed, as it appeared at trial, the novelty of the Liston device lies in the fact that it is a combination to practice the methods of the Marshall method patent, and that it is the first electronic digital computer which could successfully replace Marshall's patented apparatus

But this "novelty" cannot be said to be invention within the contemplation of § 103: Dr. Garretson provided convincing proof, unrebutted by plaintiff, that the combination as a whole, with perhaps minor variations in particular elements, would have been apparent to one familiar with the art.

None of the extrinsic aids previously discussed with reference to the Marshall method patent require a contrary conclusion. The only references cited by the Examiner in granting the Liston patent were the three Marshall patents; the file wrapper for the Liston patent itself is not in evidence, but there is no indication that the Patent Office gave careful consideration to the problem of finding invention in a combination of old elements.

The "signposts" pointing to validity for the Marshall method patent do not point in the same direction for the Liston patent. Plaintiff acquired Marshall's patent rights in the spring of 1967, and contracted very shortly thereafter with Microdyne, Inc., to develop an electronic speed computer to supplant the Marshall electro-mechanical apparatus. An initial "breadboard" device was delivered in September, 1967; due to a number of inadequacies, this was redesigned in November, 1967. Field tests were then run on 25 of these redesigned modules from January through April of 1968, with a series of improvements being made as the results of the tests came in. Finally, on March 20, 1968, Microdyne was given approval to commence assembly of the first 250 production units; these units were first shipped to customers at the end of May, 1968.

■ Thus, it cannot be said that the Liston device was a response to a long-felt need, since the Marshall method patent had only been issued two years earlier. No evidence appears that there were many unsuccessful attempts to solve the problem of converting the long-felt need, since the Marshall meth-

Marshall apparatus into a fully integrated electronic digital computer. Rather, the history of the Liston patent reveals a concerted engineering effort to create a workable electronic prototype, proceeding in stages to remove the "bugs" from the model as it developed, with little real impediment. The real "invention" embodied in the Liston patent, as it turns out, was already patented—by Marshall. It is therefore my conclusion that the Liston patent is invalid for obviousness, as defined by 35 U.S.C. § 103.

*b.   Liston Patent On Sale or In Public Use*

■ Although the foregoing would dispose of the issue of the Liston patent's validity, mention might be made of defendant's contention that the Liston device was on sale or in public use more than one year before the filing date of February 27, 1969. This is based on the fact that plaintiff had received, in late 1967 and early 1968, several orders for electronic VASCAR devices from potential customers who had become aware that plaintiff was in the process of developing an electronic speed computer. Plaintiff also in this same period sent out a list of tentative performance specifications for its electronic VASCAR, in response to a request from the State of Ohio. In addition, the vice-president of plaintiff's Signal Division responded to a similar order from the State of North Carolina (which did not specify whether the VASCAR devices were mechanical or electronic), that in the future all VASCAR devices would be of an electronic type; enclosed in the letter also were photographs of dummy mockups of the tentative modules.

This is insufficient to demonstrate that the new electronic VASCAR units were "on sale" at this period. At the time of this correspondence, plaintiff had not yet developed for commercial production the device which would be described in the Liston patent; nor had

**1240**

it any workable units of the electronic VASCAR for sale. Indeed, defendant has not met its burden of establishing that plaintiff ever offered for sale on an unsolicited basis, even for future delivery, its electronic VASCAR. See Hobbs v. United States Atomic Energy Commission, 451 F.2d 849 (5th Cir. 1971).

### IV. Defendant's Counterclaims

As for defendant's affirmative defense of patent misuse, and its counterclaims for unfair competition, antitrust violations, and trademark abuse, a brief discussion of the record should suffice to demonstrate that defendant has failed to make out its contentions.

Defendant basically relies on two arguments in support of its claims. First, it presses the fact that plaintiff has never licensed anyone other than purchasers of its VASCAR computer to practice the Marshall methods; indeed, plaintiff has apparently never set a price on such a license, but instead includes the "implied license" in the purchase price of the computer. This practice, it is argued, amounts to an illegal tying arrangement, whereby plaintiff is able to increase its monopoly power beyond the normal bounds of its patents.

■ The evidence in the case reveals, however, that plaintiff has never been requested to grant a license under the Marshall method patent, independent of its VASCAR device, nor has it ever, consequently, refused a license to any applicant. Arthur Marshall, indeed, testified at trial that he offered a license to defendant in the fall of 1971, after the commencement of this suit. As noted *supra*, page 1228, plaintiff had the right to rely upon the validity of its Liston patent: since it owned the method patent, it could legitimately proceed to sell a device to practice those methods. On this state of the record, it cannot be said that plaintiff's sales practices and

failure to grant a separate license under the Marshall method patent constitute patent misuse or any conceivable violation of the antitrust statutes.

■ Secondly, it is asserted that plaintiff has locked defendant out of certain competitive bids, by causing various state purchasing agencies to utilize specifications prepared by the plaintiff for inviting these bids; allegedly, the specifications are not functionally required for efficient speed detection, but serve rather to exclude defendant's TDS computer from consideration, since it does not conform to the requirements of such bid invitations. The evidence at trial established that it was indeed standard practice in the bidding process for a manufacturer of speed computers to submit proposed "specifications" which in effect amounted to a description of the capabilities and operation of its own device. Defendant engaged in this practice as well, and succeeded in changing several proposed specifications to conform to its own device. It is also clear that the governmental agencies were free to select among the proposals, and even to change their specifications —which they did in three instances to defendant's advantage. At the same time, there were indications at trial that the specifications attacked by defendant as nonfunctional—e. g., the storage capacity and unit of measure for the distance and time registers—might produce a more efficient computer. In sum, I cannot find in these practices either an intent or an attempt to monopolize the sale of electronic speed computers.

■ Defendant also purports to find in various actions by plaintiff further "evidence" of unfair competition, patent misuse, and antitrust violations. It cites the fact that plaintiff informed several prospective customers that it owned the patents in suit and had brought an infringement action against defendant. Plaintiff likewise wrote the Community College of Raleigh, North Carolina, that it would be a violation of its Marshall

method patent if the college were to utilize a TDS computer in demonstrating the Marshall methods to police officers. It is true also that plaintiff brought suit for infringement in July, 1969 against the American Data Company and others. Unlike defendant, however, I am unable to find any untoward significance in these activities: plaintiff in these actions was understandably proceeding to protect its rights as provided by law, and there is no indication that the suits were a sham.

Defendant also finds fault in the March 16, 1967 agreement, as supplemented by the August 12, 1968 agreement, whereby the Marshall group assigned its rights in the Marshall patents and the trademark VASCAR to the plaintiff. This set of agreements is alleged to constitute a conspiracy between the parties to divide the market for electronic speed computers, with the intent to monopolize the same. By the agreements, plaintiff received all interests in the Marshall patents, and rights in the Western Hemisphere to use the registered trademark VASCAR. The significance of this "market division" is almost totally undercut by the uncontested fact that neither Marshall nor plaintiff has ever attempted to market speed computers of any kind in the Eastern Hemisphere; nor is there any evidence that significance was ever intended to be placed by the parties on this passage. Also under the agreement, the plaintiff covenanted it would not contest the validity of the Marshall patents, and that it would prosecute suits for their infringement—surely typical and proper provisions in this general context.

Although the issue is not addressed in the pleadings, defendant next charges that plaintiff has induced purchasers to publicly display and use the term VASCAR in certain uncontrolled fashions, similar to the "radar" it replaces; this, it is argued, justifies stripping plaintiff of its trademark protection for the word VASCAR. Moreover, it is urged that such use of the name creates yet another barrier to the successful marketing of defendant's TDS device. Again, defendant produced no evidence that plaintiff had actively sought to induce such "uncontrolled" usages of its trademark; nor, for that matter, do such usages actually appear in the record. Finally, defendant asserts that plaintiff had unfairly disparaged the quality of its TDS computers, and that plaintiff obtained its patents illegally and fraudulently. But no evidence was introduced to support these bare allegations.

## V. CONCLUSION

In conclusion, I find that defendant's manufacture, sale and use of the TDS electronic speed computer infringes plaintiff's Marshall method patent directly and indirectly as alleged. I find further that plaintiff's Liston patent is invalid for obviousness, and therefore not entitled to protection against defendant's infringement. Finally, defendant has not made out satisfactorily at trial any of its counterclaims sounding in unfair competition, trademark or patent misuse, or antitrust.

On the basis of the foregoing conclusions, the parties and their counsel should settle an order and judgment disposing of the issues in this case. In this regard, plaintiff has requested an injunction restraining defendant and all of its privies from further infringement of the patents. From what has been said, it is clear that plaintiff is entitled to an injunction only in respect to the Marshall method patent. 35 U.S.C. § 283. Also, of course, plaintiff has sought damages for defendant's infringement. 35 U.S.C. § 284. From the record heretofore made, it might be surmised that the damages for infringement of the Marshall patent will not amount to any substantial sum, if for no other reason because the defendant has sold only 250 of its units which embrace the method invented by Mr. Marshall. If

plaintiff still seriously presses the issue of damages, it is theoretically entitled to an accounting. Counsel, therefore, are advised that this court will refer for hearing and report on any accounting issues to a magistrate of this court upon specific request of plaintiff's counsel. Finally, all other issues have been plainly enough resolved heretofore in this opinion to enable counsel to settle an appropriate order and judgment on those matters.

### APPENDIX A

(Marshall method patent claims) 3,-182,331 in the shape, size and arrangement of parts may be resorted to, without departing from the spirit of the invention or scope of the subjoined claims.

Having thus described my invention, I claim:

1. A method of determining and identifying the speed of a checked vehicle from a checking vehicle wherein said checking vehicle has a distance measuring unit which can measure and identify a selected distance traveled by said checking vehicle and a time measuring unit which can measure time and a directly readable speed measuring means which can combine said selected distance and time to identify the speed of said checked vehicle comprising the steps of

starting the time measurement when the checked vehicle passes a first selected point,

stopping the time measurement when the checked vehicle passes a second selected point, said time starting and stopping steps being accomplished by starting and stopping said time measuring unit,

moving said checking vehicle from said first to said second selected point over substantially the same path traveled by said checked vehicle,

starting the distance measurement when the checking vehicle passes said first selected point,

stopping said distance measurement when the checking vehicle passes said second selected point, said distance starting and stopping steps being accomplished by starting and stopping said distance measuring unit, combining the resultant identified time measurement and distance measurement in said directly readable speed measuring means in a predetermined manner to produce a speed identification, the distance measurement steps being independent as to time of execution whereby the selected distance may be measured before, during and/or after the time measurement steps.

2. A method of determining and identifying the speed of a checked vehicle from a checking vehicle wherein said checking vehicle has a distance measuring unit which can measure and identify a selected distance traveled by said checking vehicle and a time measuring unit which can measure time and a directly readable speed measuring means which can combine said selected distance and time to identify the speed of said checked vehicle comprising the steps of

starting the time measurement when the checked vehicle passes a first selected point,

stopping the time measurement when the checked vehicle passes a second selected point, said time starting and stopping steps being accomplished by starting and stopping said time measuring unit,

moving said checking vehicle from a first to a second reference point over a path equal to the path traveled by said checked vehicle,

starting the distance measurement when the checking vehicle passes said first reference point equivolently related to said first selected point,

stopping said distance measurement when the checking vehicle passes said second reference point equivalently related to said second selected point, said distance starting and

stopping steps being accomplished by starting and stopping said distance measuring unit,

combining the resultant identified time measurement and distance measurement in said directly readable speed measuring means in a predetermined manner to produce a speed identification, the distance measurement steps being independent as to time of execution whereby the selected distance may be measured before, during and/or after the time measurement steps.

3. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as defined in claim 1 and including the step of recording the speed by making a permanent record on a recording material conforming with the speed identification produced by said directly readable speed measuring means.

4. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as defined in claim 2 and including the step of recording the speed by making a permanent record on a recording material conforming with the speed identification produced by said directly readable speed measuring means.

5. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as identified in claim 2 and wherein the distance measurement steps occur prior to the time measurement steps to enable the checking vehicle to be in a fixed position when timing the checked vehicle.

6. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as defined in claim 2 and wherein the distance measurement step occurs after the starting of the time measurement step whereby the checking vehicle may be distant from said first reference point at the time of starting the time measurement.

7. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as defined in claim 2 and wherein the time measurement steps and the distance measurement steps occur simultaneously with the checking vehicle traveling substantially the same path traveled by said checked vehicle.

8. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as defined in claim 2 and wherein the starting at the time measurement step and the distance measurement step occurs simultaneously as the checked vehicle passes the checking vehicle and the stopping of the time measurement step occurs at said second selected point and the stopping of the distance measurement step occurs at said second reference point to enable determination of the speed of a passing checked vehicle without traveling at the same speed as the checked vehicle.

9. A method of determining and identifying the speed of a checked vehicle from a checking vehicle as defined in claim 2 and wherein the checked vehicle is traveling toward said checking vehicle and wherein the starting of the time measurement step occurs when the checked vehicle passes a first selected point, the stopping of the time measurement step and the starting of the distance measurement step occurs when the vehicles pass each other in opposite directions, and the stopping of the distance measurement step occurs at the second reference point.

References Cited by the Examiner

UNITED STATES PATENTS

| 1,907,549 | 5/33 | Kahrs | ..............346—1 |
| 2,341,118 | 2/44 | Rodanet | .............346—18 |
| 2,871,088 | 1/59 | Abell | ...............346—1 |
| 2,903,322 | 9/59 | Webster | .............346—18 |

LEO SMILOW, Primary Examiner.

## APPENDIX B

(Liston patent claims) 3,530,382

While we have described our invention in certain preferred forms, we do not intend to be limited to such forms, except insofar as the appended claims

are so limited, since modifications coming within the scope of our invention will readily occur to those skilled in the art, particularly with our disclosure before them.

We claim:

1. Apparatus intended to be mounted in one motor vehicle and operated by a driver thereof for measuring the average speed of another motor vehicle or target vehicle being observed by the driver of the one vehicle, the improvement comprising, in combination, distance pulse generating means connected to the one vehicle for generating a plurality of electrical distance pulses the number of which is proportional to distance travelled by said one vehicle, manually operable distance switch means, time pulse generating means for generating a plurality of electrical time pulses the number of which is proportional to elapsed time, manually operable time switch means, electrical distance counter means for counting said distance pulses, said distance switch means serving to operatively connect said distance counter means with said distance pulse generating means, electrical time counter means for counting said time pulses, said time switch mean serving to operatively connect said time counter means with said time pulse generating means, divide circuit means for in effect dividing the number of distance pulses in said distance counter means by the number of time pulses in said time counter means whereby the resulting quotient will indicate the speed of the target vehicle, and speed readout means for visibly displaying said speed.

2. The invention of claim 1 where said distance pulse generating means is connected mechanically to a mechanical drive component of the one vehicle so as to be driven therefrom an amount proportional to the distance travelled by the one vehicle.

3. The invention of claim 1 including distance register means connected between said distance counter means and said divide circuit means, and means for transfering the distance information in the distance counter means to the distance register means on a non-destruct basis so as to permit repeated use of the same distance information in subsequent speed computations.

4. The invention of claim 1 including compute start means for initiating a speed computation by said divide circuit means, said compute start means being automatically operable in response to four conditions comprising the turning on of said distance switch means, the turning off of said distance switch means, the turning on of said time switch means and the turning off of said time switch means.

5. The invention of claim 4 where said compute start means includes four element "and" gate means having four inputs, a first gate element being enabled when said distance switch is turned on, a second gate element being enabled when said distance switch is turned off, a third gate element being enabled when said time switch is turned on, and a fourth gate element being enabled when said time switch is turned off, said gate means being responsive to the foregoing four enables to produce an output signal which is utilized to initiate a speed computation by said divide circuit means.

6. The invention of claim 1 where said divide circuit means includes subtractor means which repeatedly subtracts the number of said time pulses from the number of said distance pulses, means for stopping the computation process when the number of remaining distance pulses is reduced to zero or becomes negative, and speed counter means for counting the number of successful subtractions prior to the stopping of the computation process, said speed counter means being connected with said speed readout means.

7. The invention of claim 6 including distance shift register means connected between said distance counter means, and said subtractor means, means for transfering the distance information in the distance counter means to said distance shift register means on a nondestruct basis so as to permit repeated use of the same distance information in subsequent speed computations, control counter means pulsed by computer clock means for controlling the feeding of the distance information in said distance shift register means and the time information in said time counter means to said subtractor means simultaneously and in serial fashion, the distance remainder information being fed back to said distance shift register means after each subtraction.

8. The invention of claim 7 where binary multiplier means is added to the least significant side of said distance shift register means, and sign-sensing means is added to the most significant side of said distance shift register means, said sign-sensing means being utilized to stop the computation process when the distance remainder in the distance shift register means goes through zero and becomes negative.

9. The invention of claim 6 where said speed counter means comprises a binary coded decimal counter, means for transmitting one pulse to said speed counter means each time a successful subtraction is performed, and lamp segment decoder/driver means connected with said speed counter means, said speed readout means comprising a lamp segment display connected with said lamp segment decoder means for displaying a lighted digital speed reading corresponding to the number of pulses transmitted to said speed counter means.

10. The invention of claim 1 including reset means selectively operable to reset the entire apparatus or to reset all of the time components and readout means without resetting the distance counter means.

11. The invention of claim 1 where said time pulse generating means compromises oscillator means which produces a predetermined number of electrical time pulses per second, said oscillator means being connected to said time counter means by said manually operable time switch means whereby said time counter means will count said time pulses only when said time switch means is turned on.

12. The invention of claim 1 where said distance counter means and said time counter means each comprises a binary counter.

13. The invention of claim 1 including means responsive to overflow pulses from said distance counter means or said time counter means to indicate to an operator that the capacity thereof has been exceeded.

14. The invention of claim 1 including computer clock means and control counter means for controlling the feeding of the distance information in the distance counter and the time information in the time counter to said divide circuit means, said time and distance information being fed to said divide circuit means simultaneously in serial fashion.

15. The invention of claim 1 where said distance pulse generating means comprises a light source in combination with photo-sensitive means, and rotatable light interrupting means interposed between said light source and said photosensitive means, said interrupting means having a plurality of circumferentially spaced openings which permit light from said light source to strike said photosensitive means a predetermined number of times for each revolution of said interrupting means, and means connecting said interrupting means with a mechanical drive component of said one vehicle whereby said interrupting means will be driven from said drive component an amount proportioned to the distance travelled by said one vehicle.

16. The invention of claim 1 where said time pulse generating means is man-

ually adjustable to permit variation of the frequency thereof for calibration purposes.

17. The invention of claim 14 where said interrupting means is connected to the odometer cable of said one vehicle so as to be rotated thereby.

18. The invention of claim 1 including error indicating means for indicating to an operator that an error has been made in the manual operation of the apparatus, said error indicating means being responsive to any of the following conditions comprising turning on the distance switch for a distance in excess of the capacity of the distance counter, turning on the time switch for a time in excess of the capacity of the time counter, turning on the distance switch a second time without clearing the distance counter of information previously stored therein, and turning on the time switch a second time without clearing the time counter of information previously stored therein.

19. Apparatus intended to be mounted in one motor vehicle and operated by a driver thereof for measuring the average speed of another motor vehicle or target vehicle being observed by the driver of the one vehicle, the improvement comprising, in combination, distance pulse generating means connected to the one vehicle for generating a plurality of electrical distance pulses the number of which is proportional to distance travelled by said one vehicle, said distance pulse generating means being connected mechanically to a mechanical drive component of the one vehicle so as to be driven therefrom an amount proportional to the distance travelled by the one vehicle, manually operable distance switch means, time pulse generating means for generating a plurality of electrical time pulses the number of which is proportional to elapsed time, manually operable time switch means, electrical distance counter means for counting said distance pulses, said distance switch means serving to operatively connect said distance counter means with said distance pulse

generating means, electrical time counter means for counting said time pulses, said time switch means serving to operatively connect said time counter means with said time pulse generating means, divide circuit means for in effect dividing the number of distance pulses in said distance counter means by the number of time pulses in said time counter means whereby the resulting quotient will indicate the speed of the target vehicle, distance register means connected between said distance counter means and said divide circuit means, means for transferring the distance information in the distance counter means to the distance register means on a non-destruct basis so as to permit repeated use of the same distance information in subsequent speed computations, compute start means for initiating a speed computation by said divide circuit means, said compute start means being automatically operable in response to four conditions comprising the turning on of said distance switch means, the turning off of said distance switch means, the turning on of said time switch means and the turning off of said time switch means, and speed readout means for visibly displaying the speed as determined by said divide circuit means.

20. The invention of claim 19 where said divide circuit means includes subtractor means which repeatedly subtracts the number of said time pulses from the number of said distance pulses, means for stopping the computation process when the number of remaining distance pulses is reduced to zero or becomes negative, and speed counter means for counting the number of successful subtractions prior to the stopping of the computation process, said speed counter means being connected with said speed readout means.

21. Apparatus intended to be mounted in one motor vehicle and operated by a driver thereof for measuring the average speed of another motor vehicle or target vehicle being observed by the driver of the one vehicle, the improvement

comprising, in combination, distance pulse generating means connected to the the one vehicle for generating a plurality of electrical distance pulses the number of which is proportional to distance travelled by said one vehicle, said distance pulse generating means being connected mechanically to a mechanical drive component of the one vehicle so as to be driven therefrom an amount proportional to the distance travelled by the one vehicle, manually operable distance switch means, time pulse generating means comprising oscillator means which produces a predetermined number of electrical time pulses per second, manually operable time switch means, binary distance counter means for counting said distance pulses, said distance switch means serving to operatively connect said binary distance counter means with said distance pulse generating means, binary time counter means for counting said time pulses, said oscillator means being connected to said time counter means by said manually operable time switch means whereby said binary time counter means will count said time pulses only when said time switch means is turned on, divide circuit means for dividing the number of distance pulses in said binary distance counter means by the number of time pulses in said binary time counter means whereby the resulting quotient will indicate the speed of the target vehicle, said divide circuit means including subtractor means which repeatedly subtracts the number of said time pulses from the number of said distance pulses, means for stopping the computation process when the number of remaining distance pulses is reduced to zero or becomes negative, speed counter means for counting the number of successful subtractions prior to the stopping of the computation process, speed readout means connected to said speed counter means, distance register means connected between said binary distance counter means and said divide circuit means, means for transferring the distance information in the binary distance counter means to the distance register means on a nondestruct basis so as to permit repeated use of the same distance information in subsequent speed computations, compute start means for initiating a speed computation by said divide circuit means, said compute start means being automatically operable in response to four conditions comprising the turning off of said distance switch means, the turning off of said distance switch means, the turning on of said time switch means, and the turning off of said time switch means, reset means selectively operable to reset the entire apparatus or to reset all of the time components and readout means without resetting the binary distance counter means, and computer clock means and control counter means for controlling the feeding of the distance information in the distance register means and the time information in the binary time counter means to said divide circuit means.

### References Cited
UNITED STATES PATENTS

3,182,331 5/1965 Marshall ........324—70 X
3,276,029 9/1966 Marshall ........346—18
3,441,207 4/1969 Marshall ........346—18 X

MICHAEL J, LYNCH, Primary Examiner

U.S. Cl. X.R.

235—92, 151.32; 346—18