**ORTHOPEDIC EQUIPMENT COMPA-NY, INC., Appellant, Cross-Appellee,**

v.

**ALL ORTHOPEDIC APPLIANCES, INC., Appellee, Cross-Appellant.**

**Nos. 83-513, 83-525.**

United States Court of Appeals, Federal Circuit.

May 23, 1983.

James D. Hall, South Bend, Ind., for appellant, cross-appellee.

Don K. Harness, Birmingham, Mich., argued, for appellee, cross-appellant; Jeffrey A. Sadowski, Birmingham, Mich., on brief.

Before NICHOLS, Circuit Judge, COWEN, Senior Circuit Judge, and BALDWIN, KASHIWA and MILLER, Circuit Judges.

NICHOLS, Circuit Judge.

Appellant, cross-appellee, Orthopedic Equipment Company, Inc. (OEC), is the owner, by assignment, of U.S. Patent No. 3,935,858 ('858 patent) issued on February 3, 1976, entitled "Knee Immobilizer." In 1980, OEC brought suit in the United States District Court for the Eastern District of Michigan, alleging that its '858 patent was infringed by several knee immobilizer models manufactured and sold by appellee, cross-appellant, All Orthopedic Appliances, Inc. (AOA). AOA defended on the grounds that the '858 patent was invalid and noninfringed. AOA also alleged that the '858 patent was unenforceable due to fraudulent and inequitable conduct in the prosecution of the '858 patent application in the Patent and Trademark Office (PTO). On July 22, 1982, final judgment was entered by the district court holding all five claims of the '858 patent invalid for obviousness. The district court also found that if the claims of the '858 patent are valid, claims 1–5 would have been literally infringed by AOA Model C–127 and claims 4 and 5 (but not claims 1–3) literally infringed by AOA Models 1201, 1273, 1313, and 1318. The district court also found that AOA Models 1201, 1273, and 1318 were equivalents of the device of OEC claim 1, but that the doctrine of file wrapper estoppel prevented a finding of infringement. Finally, the district court found that OEC's conduct during the prosecution of its '858 patent did not constitute grounds for rendering the patent unenforceable, and that this was not an exceptional case under 35 U.S.C. § 285 justifying an award of attorney fees.

OEC appeals from the determinations of invalidity and of noninfringement of claims 1–3 by AOA Models 1201, 1273, and 1318, and from the application of the doctrine of file wrapper estoppel. AOA appeals from the determination that the '858 patent was not unenforceable and from the denial of an award of attorney fees. We affirm the district court's decision invalidating claims 1–5 of the '858 patent for obviousness and, because this holding is dispositive, we do not reach the issue of infringement. We also affirm the district court's decision that OEC's conduct during the prosecution of the '858 patent was not fraudulent or inequitable, and that an award of attorney fees is not justified in this case.

*Background*

This litigation relates to adjustable knee immobilizers, an orthopedic soft goods device used in the treatment of knee region problems. A knee immobilizer, whose purpose is to prevent the bending of the leg at the knee, comprises a wide flexible cover applied snugly around the leg of the patient at knee level. Strap members or fasteners extend around the leg of the patient and are connected to ring members on the opposite side of the cover so as to close and secure the cover around the leg. Immobilizing stays to prevent flexing of the knee are disposed so that when the cover is properly positioned about the knee, one set of stays is at the posterior (behind the knee) and one set of stays is along each side of the knee. The strap members commonly entail fabric straps with ends stitched at spaced predetermined points relative to the stay pockets and the immobilizer cover. Similarly, the ring members are secured by fabric straps to the immobilizer cover at spaced intervals. The once familiar corset purported to solve comparable engineering problems; we have here a corset for the injured knee.

Because of the inherent need to accommodate a wide range of sizes and conditions of patients, it is desirable that orthopedic soft goods be adjustable. Various means have been used to accommodate adjustment of such goods, including "Velcro"-type fasteners. Such a fastener comprises a plastic sheet which has a large number of closely spaced hook members projecting from one face of the sheet and which is secured to one of the parts to be connected. The other part to be connected has a myriad of loops with which the hook members are engageable by simply pressing the two parts togeth-

er, the loop member being commonly referred to as the "pile" member. The interengagement of many hook members with pile loops effects a strong connection between the attached parts at any selected adjustment or angular position so as to resist separation of the parts by a pull exerted in the plane of the interengaging parts. The parts are readily separable by a simple peeling action effected by a pull on one end of a part in a direction at an angle to the plane of the interengaging parts.

"Velcro"-type fasteners have been made, used, and sold in the United States since at least 1962 and provide three basic functions—adjustability, removability, and closure. These fasteners have been used on various orthopedic soft goods including traction belts, cervical collars, and wrist retainers prior to 1974. In recent years, as the "Velcro" materials have lessened in cost, "Velcro"-type hook members have been increasingly combined with a pile member comprising a relatively inexpensive open loop fabric laminated to a breathable polyurethane foam, commonly marketed under the trademark "Velfoam," to provide adjustable attachment of parts of orthopedic devices to the covers of those devices.

In 1974, OEC marketed a knee immobilizer, the '858 invention, in which the side stay components (rigidifying means) are detachable from and adjustable on the cover, secured by "Velcro"-type hooks which interlock with the "Velfoam"-type outer surface of the knee immobilizer cover. The knee immobilizer also has "securement means" (*i.e.,* strap and ring fasteners) carried by the rigidifying means by which the immobilizer cover can be secured about the knee of the patient. The advantage of the OEC knee immobilizer is to provide adjustability of the side stays. This is accomplished by the use of "Velcro" on the pockets in which the side stays are inserted and to which the strap and ring fasteners are attached, and the use of "Velfoam" material for the cover of the knee immobilizer. According to OEC, the invention reduced the number of different sized knee immobilizers required to be kept in inventory from approximately 18 to 4.

## OPINION

### I—*Validity*

The central issue on appeal is whether the district court erred in finding the '858 patent claims invalid for obviousness under 35 U.S.C. § 103. Accordingly, we must refer to *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), which establishes the test for obviousness.

* * * Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. * * *

[383 U.S. at 17–18, 86 S.Ct. at 693–694.]

### A. *Scope and Content of the Prior Art*

The scope of the prior art, as determined by the district court and uncontested here, includes knee immobilizers and other orthopedic soft goods which use "Velcro"-type fastening means to attach straps or other parts to the cover of the device and to provide adjustability.

The prior art references specifically relied on by the district court in invalidating the '858 patent for obviousness include U.S. Patent No. 3,831,467 ('467 Moore patent) and U.S. Patent No. 3,587,572 ('572 Evans patent) for knee immobilizers. The district court also referred to U.S. Patent No. 3,572,327 ('327 Beard patent) as the most relevant prior art relating to prior use of "Velcro"-type fastening means in orthopedic soft goods other than knee immobilizers. We shall discuss each briefly.

The '467 Moore patent discloses a knee immobilizer as shown in figure 7 of the specification:

FIGURE 7

The knee immobilizer has a flexible cover 16, a fixed posterior stay pocket (center) having stays inserted therein, and removable side stays 52 in fixed stay pockets on the cover. The straps and rings are sewn to both the stay pocket and the cover, and may be affixed either on top of the stay pocket or between the stay pocket and the cover. "Velcro"-type material on the straps provides for length adjustment.

The '572 Evans patent discloses a knee immobilizer of elastomeric material as shown in figure 4 of the specification:

FIGURE 4

The immobilizer has a flexible cover 24 of elastomeric material that may be adjustably secured about a wearer's knee with a "Velcro"-type fastener 40, 42 securing the cover. The cover is provided with a plurality of side stay pockets 34. Adjustability is achieved by positioning the movable stays in the appropriate side pockets and adjusting the diameter of the immobilizer with the "Velcro"-type fastener.

The '327 Beard patent discloses a pelvic traction belt utilizing "Velcro"-type fastening means for fastening a belt body about the waist of a patient of any size. "Velcro"-type fastening means are also utilized to adjustably secure yokes, which are connected to the traction weights, to desired pull points on the belt body.

B. *Differences between the claimed invention and the prior art*

The patent in suit contains two independent claims—claim 1 and claim 4. Claim 1 provides:

An immobilizer for the knee of a patient comprising

a flexible cover means having in planar orientation upper and lower edges and opposite side edges,

a first rigidifying means connected to said cover means between said side edges and extending from adjacent the upper edge to adjacent the lower edge of the cover means, said first rigidifying means for positioning behind the knee when said cover means is applied to the patient,

second and third rigidifying means, <u>each second and third rigidifying means including means for detachable and adjustable securement to said cover means,</u>

and means for securing said cover means about said knee,

said second rigidifying means <u>being adjustably secured to said cover means</u> between said first rigidifying means and one cover means side edge for positioning at the inside of said knee when said cover means is applied to the patient,

said third rigidifying means being <u>adjustably secured to said cover means</u> between said first rigidifying means and the other cover means side edge for positioning at the outside of said knee when the cover means is applied to the patient,

<u>said securing means for the cover means being carried by said second and third rigidifying means.</u>

[Paragraph structure and emphasis supplied.]

The underlined portions of the claim highlight the areas in which appellant alleges its invention is different from the prior art. Specifically, appellant alleges that the prior art did not show detachable and adjustable side stays (second and third rigidifying means) and securing means (such as ring and strap fasteners) *carried by* the side stays, *i.e.*, not fastened at either end to the cover. Claims 2 and 3 are dependent on claim 1 and specify that the securing means are strap and ring fasteners.

Claim 4 provides:

An immobilizer for the knee of a patient comprising

a flexible cover means having in planar orientation upper and lower edges and opposite side edges, said cover means including an outer surface formed of loop means,

a first rigidifying means connected to said cover means between said side edges and extending from adjacent the upper edge to adjacent the lower edge of the cover means, said first rigidifying means for positioning behind the knee when said cover means is applied to the patient,

second and third rigidifying means, each second and third rigidifying means including hook means for detachable and adjustable securement to said cover means at the loop means thereof,

and means for securing said cover means about said knee,

said second rigidifying means being adjustably secured to said cover means between said first rigidifying means and one cover means side edge with the hook means of the second rigidifying means interlocking with the loop means of the cover means for positioning at the inside of said knee when said cover means is applied to the patient,

said third rigidifying means being adjustably secured to said cover means between said first rigidifying means and the other cover means side edge with the hook means of the third rigidifying means interlocking with the loop means of the cover means for positioning at the outside of said knee when the cover means is applied to the patient.

[Paragraph structure supplied.]

Claim 4 differs significantly from claim 1 in two respects: (1) it specifies that the side stays are adjustably secured to the cover *with a hook and loop fastener;* and (2) it does *not* specify that the securing means are carried by the side stays. Claim 5, which is dependent on claim 4, adds the limitation that the side stays are in pockets to which the "Velcro"-type fastener is affixed. The invention of the '858 patent as shown in figure 1 of the specification is illustrated below:

FIGURE 1

There is no single piece of prior art that shows all of the elements of the foregoing claims in combination. However, the '572 Evans patent teaches the concept of side stays which are "adjustably secured" to the cover. The adjustment is provided by moving the stays from pocket to pocket on the side of the cover. The '467 Moore patent discloses stays in stay pockets and strap and ring "securing means * * * carried by" the stays. However, the stay pockets and "securing means" are both immovably affixed to the cover. In addition, the '327 Beard patent, as found by the trial judge, discloses an instance where an inventor in the orthopedic soft goods field took a product whose members had previously been sewn to the cover and made those members detachable and adjustable by using a "Velfoam" cover and "Velcro"-type fastening hooks on the members to be adjusted. The trial judge also found, based on extensive "Velcro"-type prior art patents and printed publications, that manufacturers in the medical field have long been aware of the replaceability of sewn elements with "Velcro"-type fasteners, partic-

ularly in orthopedic soft goods. These findings are not clearly erroneous.

## C. Level of Skill

■ The district court specifically found that the level of ordinary skill at the time of the invention was that of an engineer having at least a few years of design experience working in the field of developing orthopedic soft goods. Appellant attacks this finding as lacking evidentiary support and setting the level of skill at an unnecessarily high level. It, however, points to no evidence in the record establishing that the district court's finding is clearly erroneous, although the inventor himself was not an engineer. Although the educational level of the inventor may be a factor to consider in determining the level of ordinary skill in the art, it is by no means conclusive. Other factors which may be relevant in ascertaining the level of ordinary skill in the art include "the various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field * * *." *Orthopedic Equipment Company v. United States,* 702 F.2d 1005, 1011, 217 USPQ 193, 198 (Fed.Cir.1983), quoting *Jacobson Brothers, Inc. v. United States,* 512 F.2d 1065, 1071, 185 USPQ 168 (Ct.Cl.1975).

■ In view of the testimony of OEC's president and the patent experts of both sides on the educational background of those in the field, and other evidence in the record, we hold the trial judge's finding is not clearly erroneous and, accordingly, it will be sustained.

## D. Secondary Considerations

The district court also made several factual findings regarding secondary considerations. Essentially, it found that the '858 patent made possible a decrease in the inventories of orthopedic soft goods manufacturers, but found no evidence of any previous, unsuccessful attempts to reduce inventories. Thus, although the invention did achieve a result desirable in all businesses which stock goods, there was no evidence that the industry perceived a decrease in inventory as a "long felt but unsolved need." The court also found that the '858 patent device has had some degree of commercial success, but that it has not supplanted prior art devices nor has it surpassed volume sales of prior art devices in all cases.

## E. Legal Conclusion

■ Having reviewed the prior art and the contentions of the parties on appeal, we hold, as a matter of law, that the invention of claims 1–5 of the patent in suit would have been obvious to a person of ordinary skill in the art at the time the invention was made. Accordingly, those claims are invalid under 35 U.S.C. § 103.

The movability of the side stays to provide adjustability is clearly shown by the '572 Evans patent, even if not achieved by use of "Velcro" and "Velfoam." With this in mind, it would have been obvious to a person of ordinary skill in the art (as defined by the trial judge), to draw upon the vast body of "Velcro" art in existence at that time to replace the sewing of the stay pockets of the '467 Moore patent with adjustable hook and loop fasteners. This would have been nothing more than an obvious extension of the Moore and Evans teachings. Furthermore, Moore clearly illustrates that the proper placement of the strap and ring fasteners is on the stay pockets on the sides of the knee immobilizer. In making the stay pockets movable, thereby permitting adjustment of the knee immobilizer, it would have been obvious to apply Moore's teaching regarding strap placement by retaining those fasteners on the stay pocket, rather than remove them from the pockets and affix them to the cover.

Appellant urges that there was more than a mere replacement of sewn stay pockets with "Velcro" in this case. In particular, appellant relies on the testimony of its marketing director that the successful use of "Velcro" to attach the side stays to the body was contrary to the expectation of a

person of ordinary skill in the art. The witness testified that side stays attached with "Velcro" would be expected to peel off when the knee is flexed. Referring to the combination of posterior stays permanently attached to the cover and side stays attached with "Velcro," he said: "[I]t amazes you the fact as a unit it functions together * * * [i]t works as a unit. Individually it may not work but as a unit it does." This statement itself points out the flaw in appellant's "unexpected results" argument. At oral argument before this court, counsel for appellant demonstrated that when a knee immobilizer *without* posterior stays is flexed, the side stays attached with "Velcro" do, indeed, peel off. However, it is readily apparent that the side stays would not have conveniently (for the argument) separated from the cover had the posterior stays prevented flexure. Where other forces are at work to prevent the cover from flexing, it can hardly be said that it is surprising that the cover does not flex and that the side stays do not peel off. "Individually it may not work but as a unit it does." And that is what one of ordinary skill in the art would have expected.

The findings that deal with secondary considerations or objective indicia of nonobviousness as relied on by appellant, suffice to support the conclusion that the invention would have been obvious.

## II—*Misconduct During Prosecution*

We now turn to the issues raised by AOA in its cross-appeal. AOA contends that the district court erred in not finding that the claims of the '858 patent were unenforceable due to fraudulent and inequitable conduct in the prosecution of the '858 patent, and because such conduct renders this an exceptional case, the district court erred in not awarding attorney fees pursuant to 35 U.S.C. § 285. The fraud or inequitable conduct issues may be considered mooted by our conclusion stated above, but these issues remain alive as to the claim for attorney fees.

AOA contends that OEC had knowledge of prior art references relating to the use of "Velcro" in orthopedic soft goods, but delib-erately withheld such information during prosecution of the '858 patent before the PTO. The basis of AOA's contention rests in prior patent infringement litigation in which an OEC product was alleged to infringe upon the '327 Beard Patent owned by Richards Manufacturing Company. The subject matter of that suit involved an orthopedic device, a pelvic traction belt, which used "Velcro" and "Velfoam" to provide universality of application. OEC cited a substantial number of prior art references to that district court and succeeded in having the '327 Beard patent held invalid for obviousness. In the contemporaneous prosecution of its '858 patent before the PTO, however, OEC failed to cite the prior art references discovered in the '327 Beard patent litigation.

Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO. *E.g., Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362, 374, 216 USPQ 666, 674–75 (8th Cir.1982); *Oetiker v. Jurid Werke GmbH,* 671 F.2d 596, 600, 215 USPQ 21, 24 (D.C.Cir.1982); *E.I. duPont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1274, 205 USPQ 1, 22–23 (8th Cir.1980). Although inequitable conduct requires less stringent proofs as to both materiality and intent than common law fraud, mere evidence of simple negligence, oversight, or an erroneous judgment made in good faith not to disclose prior art is not sufficient to render a patent unenforceable. *Oetiker v. Jurid Werke GmbH, supra.*

The district court found that OEC failed to disclose prior art pertaining to "Velcro" uses in the orthopedic soft goods industry, but it did not believe that an intent to defraud was established by clear, unequivocal, and convincing evidence. Moreover, the nondisclosure was not found to be material; rather, the district court found that the examiner assigned to prosecution of the patent-in-suit independently ascertained the existence of the undisclosed

prior art. AOA has not shown the underlying findings of fact to be clearly erroneous. We do not think it necessarily reflects bad faith for the same counsel to take inconsistent positions in different litigation. OEC counsel have in this litigation been consistent that the material not disclosed is not relevant. A comparison of OEC counsel's positions in the two cases detracts considerably from their dignity, from which fact appellee has largely benefited. Charging fraud is another matter.

 A holding of fraud or inequitable conduct requires support in the underlying facts, and on these we must defer to the judgment of the trial judge in the absence of evidence on the record clearly establishing error. It is within the province of the trial court to ascertain the state of mind of one whose conduct is challenged and to determine whether the evidence establishes an intentional misrepresentation or, at the least, gross negligence as to the truth. In any event, while we cannot place our stamp of approval on the overall actions of OEC, we agree with the district court's holding that OEC's conduct during prosecution of the '858 patent does not constitute fraud or inequitable conduct.

 We therefore affirm the district court in its denial of an award of attorney fees under 35 U.S.C. § 285. A finding of fraud or inequitable conduct during the prosecution of a patent is not necessary to constitute an "exceptional" case under this section, as it may be exceptional for some other reason, but an award of attorney fees is within the discretion of the trial judge. We find no abuse of discretion in denying an award of attorney fees in this case.

### Conclusion

We affirm the finding of the district court that claims 1–5 of the '858 patent are invalid for obviousness. The finding of the district court that OEC's conduct during the prosecution of its '858 patent did not constitute fraud or inequitable conduct, and the denial of an award of statutory attorney fees is also affirmed.

AFFIRMED.