**TENNANT COMPANY, Plaintiff,**

v.

**HAKO MINUTEMAN, INC. and Hako-Werke GmbH & Co., Defendants.**

**No. 84 C 10670.**

United States District Court, N.D. Illinois, E.D.

Dec. 31, 1986.

---

Joel H. Bock, Alfred H. Plyer, Jr., Kinzer, Plyer, Dorn & McEachran, Chicago, Ill., Jerry W. Snider, Feagre & Benson, Minneapolis, Minn., for plaintiff.

James J. Hill, Emrich & Dithmar, Frank R. Reynolds, Jr., Reynolds & Reynolds, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Tennant Company manufactures mobile sweeping machines. It sues Hako-Werke GmbH and Hako Minuteman, Inc. (collectively "Hako"), manufacturer and United States distributor, respectively, of the Hako 1100 sweeping machine, for patent infringement and false marking. Hako counterclaims that Tennant has violated section 2 of the Sherman Antitrust Act.

Currently before the court are two motions from Tennant: one for a preliminary injunction against the alleged infringement; the other to dismiss, or in the alternative for summary judgment on, the antitrust counterclaim. Both sides have requested a evidentiary hearing on the preliminary injunction. This court finds, however, that a hearing will not be needed. On the basis of the depositions and exhibits filed with the motions, we can determine that while plaintiff probably can show a reasonable likelihood of success on the merits, it cannot demonstrate irreparable injury. Therefore, the injunction cannot issue. Tennant's motion to dismiss or for summary judgment on the counterclaim is granted.

### FACTS

Tennant owns U.S. Patent No. 3,540,070, titled "Pivotable Section for Bottom of Hopper on Sweeping Machine," issued in 1970 and due to expire in November 1987. Claim 1, the only independent claim, describes a "hopper having a movable first wall section, a main part that includes a second bottom wall section and an opening adjacent the brush to permit passage of material from the brush into the hopper...." The arrangement makes it possi-

ble for the "first wall section ... to pivot about a transverse axis between a normal position permitting material being swept to pass through said opening and an actuated position, said first wall section being of a size to substantially close said opening when it is in an actuated position...." The feature is typically used on a self-propelled sweeping machine carrying an operator.

Fig. 1.

Fig. 6.

A sweeper with such a closeable wall section on its hopper is said to have three advantages over the state of the art for sweeping machines in 1970: (1) the wall

serves to clear the hopper opening and to compress light debris into the hopper, decreasing the number of times the hopper must be emptied; (2) once the hopper is full, the wall closes the opening on the way to the dump site, keeping the trash inside from dribbling out; (3) the hopper can easily be adapted to "high dump" operation since the closed wall section also prevents any dribbling while the hopper is being lifted and tilted for dumping. Tennant used the patented construction in its model 92 from 1976 to 1983 and continues to use it in the successor model 95, both of which have been commercially successful. However, Tennant did not emphasize (or indeed mention) the closeable wall section feature in its advertising materials on these models.

From a patent standpoint, the field of sweeping machines is a relatively crowded one. The parties have submitted a number of examples of prior art to this court. Particularly at issue here are the Wason patent, No. 1,356,180 (1920), which was cited in the '070 patent application, and the Schmidt patent, No. 3,337,890 (1967), which was not. Wason's machine had a "clearing plate pivoted within the receptable adjacent the entrance opening" (claim 1), used to clear the opening of the receptacle periodi-

cally by pushing debris farther into the receptacle. The "clearing plate," however, was semi-circular in shape, could not have closed the opening, and had no relation to any dumping function. Schmidt's machine, expressly described in the claims as a "street sweeper," had a "closure means movably carried by the receptacle means for movement between a closed position closing said opening [of the receptacle] and an open position uncovering said opening" (claim 3). The "closure means" was however curved rather than flat, not part of any wall of the receptacle. Its function related only to closing the receptacle for dumping; it could not have pushed debris farther into the receptacle. There is no evidence that Schmidt's machine ever became a commercial product. The Schmidt patent issued some nine months before the application for the patent at issue here was made, and had been approved by the same Examiner who would later approve the '070 patent. A copy of the Schmidt patent was found in Tennant's files during discovery for this suit, although no one could recall when or how it got there. Hako also sent Tennant a copy of that patent in February 1985, enclosed with a letter demanding that Tennant withdraw its infringement suit.

The Wason patent

Fig. 1.

Fig. 5.

Fig. 6.

The Schmidt Patent

Fig. 1.

Hako introduced its model 1100, the accused structure here, in 1984. The 1100 has a pivoted bottom wall section which closes the hopper opening, said feature being described in its trade literature as "the revolutionary high lift dumping assembly ... its new ComTractor (Patent Pending, Trademark)." Depositions of Hako officers reveal that no one has applied for a patent for that feature. A Tennant salesman became aware of the Hako 1100 in the spring of 1984, but Tennant officers noticed the possible patent conflict only in late September or early October of that year. Tennant filed this suit in December 1984.

The Hako 1100

First with the
revolutionary high lift
dumping assembly—
Hako now introduces
its new ComTractor.*

Multiple benefits of the
ComTractor* detailed below.

● The ComTractor* can be raised
from the operator's seat to allow
light/bulky debris to enter the
broom chamber and be swept
into the hopper.

● Compacts debris inside hopper
allowing even more pick-up.

● Closes the hopper to prevent
losing debris while transporting
to dump site.

*Patent Pending
* Trademark

When the authority which controls the Los Angeles and Ontario (California) airports took bids for sweeping machines, Tennant's Anaheim, California, Norcross, Georgia, and New Jersey regional offices each submitted separate and different bids. So did Hako and two other sweeper companies. Hako's bid was significantly lower than any of the Tennant bids, and so was that of the R.J. Lison Co., but Tennant-Anaheim landed the contract since the other machines did not meet the authority's specifications.

Tennant has objected to the cost of the rather extensive discovery requested by

Hako for the antitrust counterclaim. As a compromise, this court ordered that for purposes of Tennant's motion to dismiss or in the alternative for summary judgment this court would assume that defendants can prove the facts to which the discovery was directed, namely that Tennant's share of the relevant market is approximately 80 per cent and that Tennant regularly submits three different bids from three regional offices, as it did in Los Angeles, for contracts nationwide.

## DISCUSSION

The Federal Circuit has exclusive jurisdiction over appeals of all matters this court hears under its patent jurisdiction. *See* 28 U.S.C. § 1295(a)(1). The law applicable to the patent issues before us is therefore that of the Federal Circuit. *See, e.g., Rite-Hite Corp. v. Kelley Co., Inc.,* 629 F.Supp. 1042, 1060 (E.D.Wis.1986); *Unique Concepts, Inc. v. Manuel,* 231 U.S. P.Q. 268 (N.D.Ill.1986) [Available on WESTLAW, DCTU database]. A plaintiff seeking a preliminary injunction for patent infringement must show: (1) a reasonable likelihood of success on the merits, *i.e.,* a reasonable likelihood of showing that the patent is both valid and infringed; (2) that he does not have an adequate remedy at

law and will suffer irreparable injury if the preliminary injunction does not issue; (3) that the injury to his patent rights if the injunction is not granted would outweigh the threatened harm the injunction would inflict on the defendant; and (4) that granting the injunction will not disserve the public interest. *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269 (Fed.Cir. 1985).[1]

Hako contends that plaintiff cannot show a reasonable likelihood of success on the merits first of all because its ComTractor does not infringe the '070 patent. That patent's claims, it says, do not specifically describe the pivot of the wall section as a bottom wall section. Otherwise, its defenses go to the validity of the patent. It contends that the invention of the '070 patent was anticipated by Schmidt, or alternatively was obvious from Schmidt and Wason. It also argues that the patent is unenforceable because the failure to refer to Schmidt in the application constitutes fraud in the Patent Office. Finally, it defends against the preliminary injunction by challenging the showing of irreparable injury. Tennant has an adequate remedy at law, it says, because Hako can fully compensate it with damages.[2]

---

1. Defendants argue at length that 28 U.S.C. § 1295 was not intended to give the Federal Circuit power to "overrule" the Seventh Circuit on the standards for a preliminary injunction, and that therefore we should apply the law of the Seventh Circuit here. But the Federal Circuit has done no such thing. Its test for when a preliminary injunction should issue is the traditional one. *Compare Roper,* 757 F.2d at 1269 with, *e.g., Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1435, 1441 (7th Cir.1986). Rather, the Federal Circuit has merely altered the way those standards are applied in a patent context. For example, it has emphasized, as other courts did not, that injury to patent rights is often not fully compensable in money damages and therefore may itself be irreparable injury. *See Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985); *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983), and our discussion in part III below. At most, that emphasis amounts to a greater respect for the inchoate aspects of patent rights. Injury to inchoate rights is often not translatable into damages and

thus has been held irreparable injury in the Seventh Circuit. *See, e.g., Vogel v. American Society of Appraisers,* 744 F.2d 598, 599 (7th Cir.1984). This court therefore does not find the decisions of the two circuits irreconcilable and sees no reason not to follow the Federal Circuit as the statute directs.

2. Defendants have also moved to dismiss plaintiff's count 2. That count alleges that "defendants have violated 35 U.S.C. § 292 by using and advertising the words 'patent pending' when in fact no application for patent has been made." The statute requires that such misidentification be made "for the purpose of deceiving the public," which means that plaintiff must prove intent to deceive. *Brose v. Sears, Roebuck & Co.,* 455 F.2d 763, 768 (5th Cir.1972). Defendants contend that the count is legally insufficient because it fails to specifically allege intent. This court thinks that the count, as written, fairly puts defendants on notice of the nature of the claim, which is all that the Federal Rules require. *See In re Catanella and E.F. Hutton & Co. Securities Litigation,* 583 F.Supp. 1388, 1398

The elements of a monopolization claim under section 2 of the Sherman Act are: (1) possession of monopoly power in the relevant market; and (2) use of that power to foreclose competition, gain a competitive advantage or destroy a competitor. *Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 265 (8th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). Attempted monopolization also violates section 2. It is established by (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing that purpose; and (3) a dangerous probability of success. *Id.*

Hako complains that the Los Angeles bidding practices constitute monopolization or attempted monopolization. Otherwise, Hako's antitrust counterclaim is grounded on the same allegations as its defenses to the infringement action. It also asserts that Tennant knows that the '070 patent is invalid because of anticipation, obviousness and/or fraud, and so this lawsuit is attempted monopolization.

## I. The Patent

### A. Infringement

A device infringes a patent if it falls within the scope of the claims of that patent. In determining the scope of a claim one looks to the claim's language, giving the words of the claim their ordinary and customary meaning. *McGill v. John Zink Co.*, 736 F.2d 666, 673–674 (Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Here the claim describes a "movable first wall section" attached to a "second bottom wall section," with the first section pivoting to close the opening. The language reads literally on Hako's accused structure, according to the one drawing which Hako yielded up during discovery and the pictures and text in its trade literature.

(E.D.Pa.1984); *Channel Master Corp. v. JFD Electronics Corp.*, 260 F.Supp. 568, 573 (E.D.N.

Hako contends that Tennant's proof on this issue is inadequate since it has merely submitted its patent and evidence about the Hako 1100 structure. A problem in claim construction exists, it says, because according to the prosecution history Tennant abandoned the claim which referred to the first wall section as a "bottom" wall section. However, there is no problem. The file wrapper can indeed be used as a claim construction tool to determine claim limitations. *See McGill*, 736 F.2d at 673. But even if significance attaches to the fact that "bottom" was dropped in reference to the first section, the effect would be a broadening, not a limitation. In other words, while the claim as written might be construed to also cover top or side walls, it would not cease to cover bottom walls. The claims of the patent and the structure of Hako's machine are before the court, which is all that Tennant need provide. *See Roper*, 757 F.2d at 1271. The court decides whether or not it needs an expert to assist it in reading the claims on the accused structure. *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed.Cir.1984), 756 F.2d 1574 (Fed.Cir.1985). None is required here. If the '070 patent is valid, the Hako 1100 literally infringes it.

### B. Validity

Under 35 U.S.C. § 282 a patent is presumptively valid. The presumption applies on a motion for a preliminary injunction. *Roper*, 757 F.2d at 1270; *Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398, 400 (Fed. Cir.1986). The party asserting invalidity must submit clear and convincing evidence to overcome that presumption. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed.Cir.1984). Hako believes that it has met that burden with evidence of both anticipation by Schmidt, thus making the patent invalid under 35 U.S.C. § 102, and obviousness from Schmidt and Wason, in-

Y.1966).

validating the patent under 35 U.S.C. § 103.

### 1. Anticipation

■ A patent is anticipated by prior art when each and every element of the claimed invention not only is present in a single prior art reference disclosure, but also is arranged in that prior art reference as it is in the claimed invention. *Lindemann,* 730 F.2d at 1458. Put another way, all the elements of the claimed invention must be "fully met" by the prior art reference. *Kalman v. Kimberly-Clark Corp.,* 713 F.2d 760, 772 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984), *overruled on other grounds, SRI International v. Matsushita Electric Corp.,* 775 F.2d 1107, 1125 (Fed. Cir.1985). By that standard the '070 patent is not anticipated by Schmidt. Most obviously, Schmidt's "closure means" is not part of the bottom wall of his hopper but rather is carried independently on its own pivotable support inside the hopper. In an effort to avoid that conclusion, Hako reiterates here its argument that the Tennant patent is not limited to a first bottom wall section. However, the point is that Schmidt's "closure means" is not part of any wall. It also does not and could not perform the function of clearing the opening and propelling debris farther into the hopper. The reference thus does not "fully meet" the claimed invention.

### 2. Obviousness

A patent is also invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The question is not whether the invention is obvious now, but whether it would have been obvious then. *Panduit Corp. v. Dennison Manufacturing Co.,* 774 F.2d 1082, 1092 (Fed. Cir.1985), *judgment vacated on other grounds,* 475 U.S. ——, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986). The fact that a prior art reference was not cited by either the applicant or the Examiner may be significant, but non-considered art ordinarily does not rise to the level of the clear and convincing evidence necessary to overcome the presumption of validity unless it is more relevant to the problem with which the inventor is concerned than the art which was cited. *Lindemann,* 730 F.2d at 1459. Further, a prior art reference must be considered in its entirety, including any disclosures which diverge from and teach away from the claimed invention. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1550 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The prior art also must be evaluated as a whole, *Panduit,* 774 F.2d at 1084, and then each reference, and the art as a whole, compared with the claimed invention in its entirety (rather than a fragment of it). *Gore,* 721 F.2d at 1550. The comparison includes not just structure but also results. *Id.* Finally, as a guard against using hindsight, a court should look at secondary considerations such as long felt but unresolved needs, failure of others and commercial success. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Panduit,* 774 F.2d at 1099; *Gore,* 721 F.2d at 1553.

Evaluating obviousness in this case is fraught with problems. At the outset, Tennant argues that the Schmidt patent cannot be the kind of clear and convincing evidence required to overcome the presumption of validity. First of all, it says, the burden is on Hako to show that the Examiner did not consider Schmidt. *See Lindemann,* 730 F.2d at 1460. Even though Schmidt was not cited, the Examiner certified that he searched the class, and he had previously been the Examiner for the Schmidt patent. Tennant argues that the most logical explanation for his failure to cite it is that he considered it less relevant than the art that he did cite. Secondly, Schmidt's problem was a street sweeper, apparently to be attached to the front of a truck, not a riding sweeper used principally indoors, so Schmidt may not be within the scope of art pertinent to the problem. *Id.*

at 1460, 1462. Finally, the question is the effect not of individual features of Schmidt and Wason but of their effect as a whole. Neither uses a *wall* section as a movable part, and Tennant argues that both therefore teach away from the solution reached in the '070 patent. *Cf. Gore,* 721 F.2d at 1551–1553.

This court, however, thinks that Hako may have a point. Schmidt seems at least as relevant as Wason. Wason developed a street or sidewalk sweeper which was not even motorized, but rather intended to be pushed by hand. Schmidt is designed for use with a power source, and also has a "high dump" capability which Wason lacked. The '070 patent could be characterized as a combination of Schmidt and Wason. It is true that the court should not be drawn into hindsight constructions which hypothetically combine various features from various prior art references. *See Panduit,* 774 F.2d at 1094–1095; *Kalman,* 713 F.2d at 774. It is fair to ask, however, whether the prior art *as a whole* would have suggested the invention to a person of ordinary skill in the art even though no single reference did. *Panduit,* 774 F.2d at 1094; *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1556 (Fed.Cir.1985). Wason discloses a plate which clears the opening and pushes debris back but does not close the opening completely. Schmidt discloses a "closure means" which closes the opening but neither clears it nor pushes debris back. It is at least not unreasonable to argue that the two together could have suggested a wall which both clears and closes.

Against that conclusion Tennant argues that the secondary considerations are in favor of validity. It characterizes the function of effective clearing as a long felt need in the sweeper industry, and presents evidence of ineffective attempts to solve the problem from its own in-house research. It further offers evidence of the substantial commercial success of the models 92 and 95. *Cf. Panduit,* 774 F.2d at 1099. Another factor worth some weight in this regard is whether the new development achieved unexpected results. *Lindemann,* 730 F.2d

at 1461. Tennant maintains that it did, that the inventor sought only a solution to the clearing problem and discovered that he had come up with dribble-free transport as well.

The evidence on these considerations, however, does not tilt entirely in one direction. Commercial success is most relevant when there is "evidence of a nexus between sales and the merits of the invention." *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983). There is more to the models 92 and 95 than just a pivotable section of its hopper wall and we have no evidence as to how many customers bought those models for that feature. Indeed, Tennant's own trade literature for those models does not even mention the feature. That fact also tends to argue against a "long felt need," at least on the part of customers. Hako also points out that Tennant did not use the feature until six years after it was patented, and that the feature has never been licensed. In short, while the models 92 and 95 may have dominated the field, one cannot be sure that the domination stemmed from the invention of the '070 patent.

An evidentiary hearing might sharpen these questions, but it would not be likely to resolve them. Ordinarily one does not attempt to try a patent on a motion for a preliminary injunction, and this court doubts that anything less than a full trial on the merits will do for the obviousness question. Since Tennant starts with a presumption of validity, and since there is a question as to whether the Schmidt patent is more relevant than the art considered by the Examiner, we cannot say that Tennant does not have a *reasonable* likelihood of success on the merits of the validity question. However, we also cannot say that Hako does not also have a reasonable likelihood of showing the '070 patent invalid for obviousness.

## C. Inequitable Conduct in the Patent Office

A patent may be unenforceable if the patentee, in prosecuting the application,

failed to disclose material prior art with an intent to mislead the Patent Examiner. *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Such conduct by an applicant has often been called "fraud in the Patent Office," but given the differences between conduct which makes a patent unenforceable and the acts which give rise to a common law action for fraud, the Federal Circuit now prefers the characterization "inequitable conduct." *Id.; see also Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed.Cir.1983). A party who raises this ground as a defense to enforcement of a patent must show inequitable conduct by clear and convincing evidence. *Kansas Jack,* 719 F.2d at 1151.

There is no bright-line rule as to what constitutes inequitable conduct in prosecuting an application; rather, the analysis is fact-dependent. *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1454 (Fed.Cir.1984). The two principal factors in the determination, which are interrelated, are materiality, an objective test, and intent or culpability, which is a subjective state-of-mind test. *Id.* at 1455; *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1364 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The undisclosed prior art must be not just relevant or pertinent, but objectively material. The party resisting enforcement of the patent must show by clear and convincing evidence not merely that an Examiner would have wanted to know of the omitted reference, but that knowing of it, there was a substantial likelihood that a reasonable Examiner would have considered it important in his decision to grant or deny the patent. *Lex Tex,* 747 F.2d at 1559; *American Hoist,* 725 F.2d at 1362–1363 and n. 2. Moreover, the omission must be subjectively culpable, *i.e.,* either intended to mislead the Examiner, or at least grossly negligent in terms of an applicant's duty of candor toward the Patent Office. Simple negligence or a good faith error in judgment is not inequitable conduct. *Lex Tex,* 747 F.2d at 1560; *Orthopedic Equipment,* 707 F.2d at 1383.

Hako's allegation of inequitable conduct rests solely on the fact that Tennant's application for the '070 patent did not bring the Schmidt patent to the Examiner's attention. There is some question whether the mere existence of Schmidt constitutes clear and convincing evidence which meets the threshold for materiality. Tennant benefits from the presumption that the Patent Examiner made an appropriate search and compared relevant prior art, citing what he considered the most relevant. *E.I. duPont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1266 (8th Cir.1980). Here the Examiner certified that he searched the classification in which Schmidt would have been found. For that matter, he was the same Examiner who had handled the Schmidt application. He did not cite Schmidt. One could logically infer that he considered Schmidt less relevant than Wason and the other art which he did cite. At any rate, Tennant has a basis for arguing that the Examiner did know of Schmidt and granted the '070 patent anyway. *Cf. Orthopedic Equipment,* 707 F.2d at 1383–1384.

However, even if we assume that the Examiner did not know of Schmidt and that it would have been important to his decision, there is no clear and convincing evidence that Tennant's failure to disclose Schmidt in its application was culpable. In the first place, Hako has not established that Tennant was aware of Schmidt when it applied for the patent. An applicant has no duty to make a diligent search for prior art and report the results of that search to the Examiner; indeed, he has no duty to search for prior art at all. Thus we cannot speak of, for example, prior art that an applicant reasonably should have known about if he had made a reasonable search. *American Hoist,* 725 F.2d at 1362. The applicant's duty to the Patent Office is rather one of candor about what he knows. Failure to cite prior art does not breach that duty if he did not know of the prior art. *Kansas Jack,* 719 F.2d at 1151–1152. Tennant had

the Schmidt patent in its files by the time discovery for this lawsuit began, but that is not proof that it knew of Schmidt at the time of the '070 application.

In the second place, even if an applicant is aware of a particular prior art reference, a good faith error in judgment about its materiality that leads to its omission from the application is not inequitable conduct. The applicant is not required to predict which items of prior art will eventually be material in court. *Cf. Kansas Jack*, 719 F.2d at 1151. The question is rather whether with the omission the applicant consciously intended to mislead the Examiner, or at least was grossly negligent toward his duty of candor. Put another way, one asks whether a reasonable person in the applicant's position, with the applicant's level of training and experience in the evaluation of prior art, either knew or should have known that the reference was material. *Lex Tex*, 747 F.2d at 1560; *Kansas Jack*, 719 F.2d at 1152. Only if the answer to that question is yes may one infer that omitting the reference was culpable. Hence the relation between proof of materiality and proof of culpability: the more obvious it is that the applicant should have known that the reference was important to a decision to grant or deny a patent, the easier it is to infer that the omission was intended to mislead, which in turn means that less independent evidence of such intent is necessary to show inequitable conduct. *Kimberly-Clark*, 745 F.2d at 1455; *American Hoist*, 725 F.2d at 1363.

Conversely, the more that reasonable persons could disagree about whether, in the context of the application, the reference was important enough to cite, the more the party seeking to establish inequitable conduct needs evidence of the applicant's actual intent to mislead the Examiner. *Kimberly-Clark*, 745 F.2d at 1455; *American Hoist*, 725 F.2d at 1463. There is no requirement that an applicant cite every relevant prior art reference of which he is aware if the additional references would be merely cumulative to those already cited. *Lex Tex*, 747 F.2d at 1560. Thus if an application discloses an ample number of

prior art references, and the art it discloses arguably is just as material to the Examiner's decision, providing as good or better grounds for a rejection than a single reference which was not disclosed, only strong evidence of an intent to mislead could turn that omission of one reference into inequitable conduct. *Kimberly-Clark*, 745 F.2d at 1455–1456. Absent such evidence, the most one could infer from the omission is an error of judgment about materiality.

■ Here the application shows a substantial disclosure of prior art, including Wason. As we have seen, whether Schmidt is more relevant than Wason is a close question even now. Thus even if the persons handling the application knew of Schmidt, they could well have decided in good faith that it was less material than the art they cited. The mere existence of Schmidt, without more, thus cannot be clear and convincing evidence that Tennant intended to hide the most relevant art from the Examiner. Hako has not shown that the '070 patent is unenforceable.

## II. The Antitrust Claim

### A. Suing on an Invalid Patent

Since a patent is a monopoly for its 17–year life, bringing a patent infringement suit to enforce that monopoly is anticompetitive. Because the monopoly is granted by statute, such anticompetitive behavior is an exception to the antitrust laws. However, if the patent is invalid, then the exception does not apply. Thus a suit on an invalid patent can violate the Sherman Antitrust Act. Hako urges that this suit be so characterized.

However, nothing in the antitrust laws requires a party to give up his right to have his legal position determined by a court when he has a reasonable basis for believing that he has an interest that deserves judicial protection. Therefore, for antitrust purposes a patentee is entitled to a presumption that he brings his infringement suit in good faith. That presumption can only be overcome by clear and convinc-

ing evidence that he acted in bad faith. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993, 996 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 689, 62 L.Ed.2d 659 (1980), 743 F.2d 1282, 1294 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). *See also Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 153 (7th Cir.1972), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). That standard usually translates into a requirement of evidence that the patentee actually knew that his patent was invalid. *Handgards*, 743 F.2d at 1288. An example would be actual knowlege that another person publicly used the identical invention before the patentee ever applied for his patent. *Id.; see generally Annot.*, 62 A.L.R. Fed. 203 (1983) (bringing of patent infringement suit as Sherman Act violation).

■ Here, Hako has not even alleged facts which could support an inference of bad faith. Its stance rests on the same arguments used to challenge the validity of the '070 patent: anticipation, obviousness, and fraud. It points out that Tennant actually knew of the Schmidt patent since February 1, 1985, when counsel for Hako sent Tennant a copy of that patent. But, as we have seen, the Schmidt patent does not anticipate the '070 patent and Tennant's failure to cite it does not amount to inequitable conduct. There is a question as to whether the patent may be invalid for obviousness, but deciding such questions is precisely what courts are for. The patent in suit has never been litigated. Even if this court were eventually to find the invention obvious, that judgment still would not give Hako an antitrust claim. There is nothing in Schmidt, or in Schmidt and Wason together, which so squarely undermines the '070 patent that Tennant should have abandoned all hope of ever having it held valid in court. In this suit Tennant seeks a judicial determination of its rights, and it has more than colorable grounds for doing so. Turning to a court under those circumstances is scarcely an antitrust violation. Tennant is entitled to summary judgment on this aspect of the counterclaim.

**B. Multiple Bids to Government Agencies**

Hako's other Sherman Act argument rests on the admittedly unusual fact that Tennant submitted three different bids to a government agency on a contract the specifications of which were allegedly closely drawn to the Tennant product. For purposes of this claim, we assume that Hako could prove that Tennant controls 80 per cent of the relevant market in sweeping machines. In other words, we assume that Tennant has monopoly power.

Monopoly power alone, however, does not violate the Sherman Act. A firm could have a massive market share simply because its product is better, or because it has demonstrated greater business acumen, or because it reached domination through historical accident. Thus, whether the claim is monopolization or attempted monopolization, the claimant must show anticompetitive behavior. *Trace X*, 738 F.2d at 261. The question thus boils down to whether multiple bidding, as alleged here, can be characterized as anticompetitive behavior.

This court does not see how it can, even assuming that Tennant repeats the practice nationwide. The desire to obtain a particular government contract is of itself not anticompetitive conduct and is not evidence of intent to monopolize. *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 13 (9th Cir.1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). That is true even when the patent owner has submitted specifications to the agency in advance of the bidding which strongly favor his product. As long as the government agency is free to decide whether or not it will adopt those specifications, there is no antitrust violation. *Federal Sign and Signal Corp. v. Bangor Punta Operations, Inc.*, 357 F.Supp. 1222, 1240 (S.D.N.Y.1973). Here there is no evidence that Tennant did anything untoward. The relevant official of the agency involved has testified by affidavit that he drew up the

specifications on the basis of the airport's needs. But even if Tennant had submitted specifications which, if adopted, gave it an excellent chance at the contract, that is not anticompetitive conduct. Any business interested in selling its product to the agency might do the same.

■ The three bids are indeed perplexing. However, they are not "collusive bidding," despite Hako's efforts to attach that label. All three offices were wholly-owned divisions of Tennant, and as a matter of law a corporation cannot conspire with itself. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984). Nor is there any evidence that their presence put any obstacle in the way of any other firm wishing to bid. There was no maximum (or minimum, despite the rhetorical efforts of Hako's counsel to so argue) allowable number of bids which could be submitted. Indeed, Hako and two other firms had no problem in placing bids before the agency. One might possibly be able to squeeze an inference of anticompetitive conduct out of the practice if the bids had been significantly lower than those anyone else could make. One recognized route to monopolization is through predatory pricing, in which a business with monopoly power prices its product at or below cost, underselling its competitors until they are driven out of business. *See, e.g., D.E. Rogers Associates, Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1436 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). Three very low bids might have created an impression of an attempt to flood the market with low-priced products. Here, however, the bids Tennant submitted were significantly *higher* than those of two other bidders, including Hako. Pricing one's product higher than the competition simply is not predatory pricing. Indeed, higher prices are more likely to benefit the competitors than to injure them. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. ——, —— —— and n. 8, 106 S.Ct. 1348, 1354–1355 and n. 8, 89 L.Ed.2d 538 (1986); *Trace X*, 738 F.2d at 268.

■ Tennant explains the multiple bids by saying that the agency asked for them. The agency wanted to be sure that Tennant's sweepers were not available at lower cost from a more distant office. That explanation is supported with deposition testimony. Hako offers nothing which disputes this explanation except its own speculations about the relations between Tennant and the agency which controls the Los Angeles airport. Summary procedure should be used sparingly in antitrust litigation, but that does not mean that every antitrust allegation must survive regardless of how implausible it is. As the Supreme Court said recently, even in antitrust litigation a party opposing a motion for a summary procedure must offer something more than "some metaphysical doubt." *Matsushita*, 475 U.S. at ——, 106 S.Ct. at 1356. *See also Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir.1980). A trier of fact could reasonably infer from the facts as alleged that Tennant was trying to sell sweeping machines to the Los Angeles airport, which is a rational business response and no violation of the antitrust laws. *Cf. Matsushita*, 475 U.S. at ——, ——, 106 S.Ct. at 1357, 1361. It could not infer anticompetitive behavior. Even assuming monopoly power, Hako's allegations on this portion of its counterclaim simply do not state an antitrust claim. The entire counterclaim will be dismissed.

### III. Irreparable Injury

Even though Tennant has demonstrated a reasonable likelihood of success on the merits, however, and even though it has rid itself of the antitrust counterclaim, this court still cannot grant the relief it seeks on the motion for the preliminary injunction. A preliminary injunction cannot issue without a showing of irreparable injury, and nothing in the materials submitted to this court suggests either that Tennant has made that showing or would be able to make it if an evidentiary hearing were held.

The traditional method of establishing irreparable harm in a motion for preliminary injunction in a patent suit is to show that the accused infringer is financially irresponsible and so unable to pay a judgment in damages. *Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 996 (Fed.Cir. 1985), *cert. denied*, 476 U.S. ——, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986). Hako's affidavits, however, make it clear that Tennant cannot characterize Hako as financially irresponsible. Hako is a major international corporation with assets more than adequate to pay any damages judgment that might result from this suit.[3]

The Federal Circuit also recognizes another route to demonstrating irreparable injury in a patent case. In its view, an injury to patent rights of itself may have irreparable consequences, since future infringement may have market effects which are not fully compensable in money. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir.1985). Thus a court should weigh the strength of the patentee's showing of a likelihood of success on the merits when considering whether irreparable harm will result if the defendant is allowed to continue production of the accused device. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 n. 7 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). A patentee who has made a clear showing that he is likely to succeed on the merits—a clear showing both that his patent is valid and that the accused device infringes it—has shown that such non-compensable injury from future infringement is likely. Therefore, he is entitled to a presumption of irreparable injury to which the alleged

infringer's ability to compensate him in damages is irrelevant. *Atlas Powder*, 773 F.2d at 1233; *Roper*, 757 F.2d at 1271; *Smith*, 718 F.2d at 1581. Tennant maintains that it has earned that presumption.

We disagree. The decisions make it clear that only a strong showing on both validity and infringement triggers the presumption. *Roper*, 757 F.2d at 1272. Tennant has made the required showing on infringement since the claims of the '070 patent read literally on the Hako 1100 "ComTractor." *See Atlas Powder*, 773 F.2d at 1233. Validity, however, is another matter. The kind of strong showing that raises the presumption is, for example, proof that the patent has already been held valid in a prior adjudication, *id.*, or the failure of the alleged infringer to present any relevant evidence contesting the patent's validity. *Roper*, 757 F.2d at 1272. Here, however, the '070 patent has not previously been litigated, and although some of Hako's arguments about validity are ineffective, by submitting the Schmidt and Wason patents Hako has raised a bona fide question of invalidity for obviousness. That measure of doubt prevents a clear showing of the patent's validity. Therefore we cannot find a presumption of irreparable injury. *Cf. Roper*, 757 F.2d at 1271.

Further, a presumption raised in this manner is rebuttable by indications that the patent owner will not actually suffer irreparable harm if the injunction is denied. *Roper*, 757 F.2d at 1272. Evidence of delay in seeking relief for the alleged infringement is such an indication. *Rexnord, Inc. v. Laitram Corp.*, 628 F.Supp. 467, 473–474 (E.D.Wis.1986). Hako argues

---

**3.** Tennant's speculations about the possible difficulties of collecting a judgment from the parent German corporation should the U.S. corporation's assets prove inadequate do not change that calculation. We have also noted that the '070 patent probably will expire before trial on the merits can be held, which Tennant characterizes as "no relief" for the infringement. However, the argument is not well taken. It is true that patent rights get no weaker as they near the end of the 17–year statutory monopoly,

*Atlas Powder*, 773 F.2d at 1234, but they also get no stronger. If Tennant cannot show irreparable injury it is not entitled to a preliminary injunction, regardless of whether it is at the end, beginning or middle of its patent rights. Similarly, Tennant will still be entitled to the same amount of damages for the period of infringement that actually occurred should it succeed at trial, no matter how slowly the case moves. Thus Tennant can still get all the relief to which it is legally entitled.

that Tennant knew of the alleged infringement by spring 1984 at the latest, when salesmen encountered Hako 1100 models in the field, but did not file suit until December of that year. Tennant counters that it is not chargeable with whatever its salesmen knew, since salesmen cannot be expected to be aware of the fine points of patent matters. Its officers only learned of the possible threat to the '070 patent much later, and Tennant filed about two months after they did. It is true that a corporation is charged with the knowledge of its agent only where the subject matter is within the scope of his authority and should, in view of the agent's duties and prior knowledge, trigger a duty to speak. *Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.Supp. 1014, 1034–1035 (N.D.Ill.1985). However, the presumption would be that a salesperson would be sensitive to the value of the unique features of his company's products in the marketplace and therefore quick to report any imitators. *See Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 763 (C.C.P.A.1980). Hako has fairly raised another question as to how irreparable Tennant's injury is.

Plaintiff cannot show that it will not collect damages, cannot make a clear showing of validity, and suffered the alleged infringement (though perhaps unknowingly) for several months before seeking relief. There are no grounds for irreparable injury. An evidentiary hearing could not cure the damages problem as long as Hako's assets exist, nor allow a clear showing of validity as long as the Schmidt and Wason patents exist. There is no basis for ordering a hearing. A preliminary injunction cannot issue.

## CONCLUSION

Defendants' counterclaim is dismissed with prejudice. Plaintiff's motion for a preliminary injunction is denied. Defendants' motion to dismiss count 2 of plaintiff's complaint is denied.